Foster LEWIS

v.

**BETHLEHEM STEEL CORPORATION and United Steelworkers of America, AFL-CIO, Local 2610 and United Steelworkers of America, AFL-CIO.**

Civ. A. Nos. 70-1127-M, M-75-1536.

United States District Court,
D. Maryland.

Oct. 19, 1977.

Kenneth L. Johnson and Norris C. Ramsey, Baltimore, Md., for plaintiff.

Douglas D. Connah, Jr., Baltimore, Md., for defendant, Bethlehem Steel Corp.

Frank Petramalo, Jr., Washington, D.C., and I. Duke Avnet, Baltimore, Md., for defendants, United Steelworkers of America, AFL–CIO, Local 2610, and United Steelworkers of America, AFL–CIO.

## MEMORANDUM

JAMES R. MILLER, Jr., District Judge.

### Introduction

Foster Lewis (Lewis), a black man, is, and has been since 1955, a Production and Maintenance (a generic term) employee of the defendant, Bethlehem Steel Corporation (Company). The Company is a Delaware Corporation doing business in the State of Maryland. During the term of Lewis' employment with the Company, he has worked at its plant at Sparrows Point, Maryland.

The defendant, United Steelworkers of America, AFL–CIO, Local 2610 (Local 2610), is the local affiliate of the defendant, United Steelworkers of America, AFL–CIO (Union) (hereinafter the Union and Local 2610 are sometimes collectively referred to as "Unions"). Local 2610 negotiates with the Company concerning its members' grievances and the terms and conditions of employment of employees in the Department in which Lewis works at the Sparrows Point Plant. The Union also negotiates with the Company on these same matters but at different levels than Local 2610. There is no dispute concerning the Unions qualifying as labor organizations within the

meaning of § 701(d) and (e) of Title VII, 42 U.S.C. § 2000e(d) and (e) and within the meaning of § 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).

In these two cases, consolidated for trial, Lewis has charged the defendants with acts of racial discrimination against him.

In his first action, Civil Action No. 70–1127–M, Lewis charges, generally, that all the defendants have treated him in a discriminatory manner vis-a-vis similarly situated white employees in regard to opportunities for training necessary for promotions, the standards applied for the awarding of promotions, and the actual awarding of promotions. (70–1127–M, Paper No. 30). In the same action, Lewis charges that the Unions have not processed his employment grievances against the Company in a manner equivalent to the Unions' processing of the grievances of similarly situated white employees. This is claimed to violate the Unions' statutory duty to render their members "fair representation." (70–1127–M, Paper Nos. 30 and 50). In Civil Action No. 70–1127–M, Lewis' claims against the Company, Local 2610, and the Union are brought under the Civil Rights Act of 1866, § 1 (42 U.S.C. § 1981), and the Labor Management Relations Act, 1947 (29 U.S.C. §§ 151 et seq.). In addition, Lewis has a claim against Local 2610 under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 200e et seq.).[1]

In his second action, Civil Action No. M–75–1536, Lewis claims the defendants retaliated against him for the filing of his first suit in that they refused to process his labor grievances against the Company, and the Company discriminated against him in the awarding of overtime and regular hours in his permanent position of Winch Truck Operator. In Civil Action No. M–75–1536, Lewis has brought claims against all the defendants under the purported authority of 42 U.S.C. § 1981. In addition, he has sued the Company and Local 2610 under 42 U.S.C. §§ 2000e et seq.

In both suits Lewis has sought back pay, attorneys' fees, and a wide range of injunctive relief relating to the defendants' alleged discriminatory practices in the areas of training opportunities, job qualifications and assignments, grievance proceedings, and seniority rights.

This Memorandum represents the court's Findings of Fact and Conclusions of Law pursuant to Rule 52, F.R.Civ.P.

### Limitations Periods In Civil Action 70–1127–M

Lewis filed the action in C.A. No. 70–1127–M on September 30, 1970. The court ruled at trial that Lewis, in order to sustain his § 1981 claims, must establish by a preponderance of the evidence that he was the subject of an act of unlawful discrimination by the respective defendants at some point on or after September 30, 1967 or that an earlier discriminatory act had an effect upon him that continued after that date because of a policy or practice of the defendants in effect or occurring after that date.[2] Md.Ann.Code, Cts. & Jud.Proc. § 5–101 (1975); Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462–463, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); Hall v. Asher, 355 F.Supp. 808, 811 n. 6 (D.Md.1973). Similarly, to sustain his Title VII claim against Local 2610, Lewis must establish by a preponderance of the evidence that he was the subject of an act or the continuing effects of an act of unlawful discrimination by Local 2610 at some point on or after July

---

1. For both cases counsel have stipulated to the jurisdiction of this court over the claims of Lewis against the defendants under the various statutes. (Pl's. Ex. 1A and Pretrial Order, Civ. No. 70–1127–M, Paper No. 97).

2. Actually, only Local 2610 was named as a defendant in the original complaint which was filed by the plaintiff *pro se.* An amended complaint was filed on December 17, 1970, which named all of the present defendants. As to the defendant company and the international union, any alleged discriminatory acts prior to December 17, 1967, would be time barred under the statute of limitations in the § 1981 suit. As the facts have developed, however, nothing occurred between September 30, 1967, and December 17, 1967, which would make the difference in those dates legally significant in this case.

17, 1968, his charge having been filed with the Equal Employment Opportunity Commission on January 17, 1969. 42 U.S.C. § 2000e–5(e).[3]

## FACTS

### A. *Civil Action 70–1127–M—The Company's Actions*

When Lewis was first employed by the Company in June, 1955, he was assigned to the General Labor Department as a laborer at a job class 2 pay scale, the lowest paying job. A Production and Maintenance employee's rate of pay rises as his job class number rises. The defendants stipulated at trial that this initial assignment was made based upon Lewis' race.

In September, 1955, Lewis resigned from the Company in order to be rehired into a different department, there being no procedure at that time for effecting a transfer. Lewis was rehired and assigned to Unit 438 in Department 32 as a laborer, job class 2. Upon resigning Lewis lost the three months' seniority he had accumulated in the General Labor Department.

Seniority Department 32 is known as "Electrical Maintenance General." It is one of several "shops" at Sparrows Point, the function of which is to perform repairs on plant equipment. It is made up of seven sub-units, or sections, including the Electrical Repair Shop, Section 438, in which the plaintiff is employed. For purposes of collective bargaining, Seniority Department 32 is treated as one department and one unit and is not treated as having sub-units or sections. This has prevailed at least since the early 1950s. The other sections, by number and name, are as follows:

(a) 337—sub-station
(b) 437—power house
(c) 400—Electric Department—windings
(d) 441—Electric Department—outside shops
(e) 442—cranes
(f) 443—Electric Department—construction

At the time this action was filed, Seniority Department 32 did include Section 436 (Electric Department—General); since then, Section 436 has been moved and it is no longer in this department.

Lewis has remained in Unit 438 to the present. Within Unit 438, Lewis has progressed from laborer to crane follower, job class 4, November, 1956; to electrical rigger, job class 7, March, 1963; and finally to winch truck operator, job class 9, from July, 1970, to the present.

Beginning in 1953 and continuing through the time of trial of this case, the Company has required the passage of an Electrical Helper Test by an employee who desires an entry level position in a line of progression leading to either (1) non-craft jobs with a current job class above 9, or (2) craft jobs all of which currently have a job class above 9. This is a pencil and paper test.[4]

Lewis first requested to take the Electrical Helper Test prior to 1958, but was told by George Moore, a white foreman, that the Company did not allow blacks to work on the electrical bench. The Company maintained its policy of not allowing blacks to take the test until March, 1960, when, apparently in response to a grievance filed with Local 2610 against the practice, 14 blacks, including Lewis, were given the test. Neither Lewis nor the other blacks passed the test. Lewis was not told his score on the test, nor were the test results shown to him.

Lewis testified at trial that he took the Electrical Helper Test three or four times after his 1960 failure without success.[5] As-

---

**3.** The July 17, 1968 date assumes that Lewis' charge was "pending" with the Commission on the date of enactment of the 1972 Act (Pub.L. 92–261, 86 Stat. 103) and would be entitled to the 180 day period of limitations contained therein. The evidence and the case law are unclear as to whether the applicable period is 180 days or 90 days.

**4.** The Company maintains and the court finds that "the reason for instituting the test was to identify persons capable of learning skills in electrical and electro-mechanical maintenance work." (Proposed Findings of Fact of defendant Bethlehem Steel Corporation, at ¶ 9, hereinafter Co's ¶).

**5.** The statement is in direct conflict with the Company's Exhibit 109, a Xerox of a file card

suming this to be true, the evidence does not disclose the dates when Lewis repeated the test nor whether at least one of his unsuccessful attempts at passing the test occurred after September 30, 1967, the statute of limitations date.

Richard Waybright, a white employee of the Company, testified at trial that he applied in 1956 for any position the Company had. He was given the Electrical Helper Test without requesting to take it. He failed the test and was told to study fractions. He retook the test several weeks later and passed it. Waybright was hired into Unit 438 as a Helper, a position leading to the higher paying noncraft and craft jobs.

In 1964 there were no black craftsmen in Department 32, nor were there any blacks in jobs leading to craft positions such as electrical helper and shop helper positions. The preponderance of blacks were in the position of Electrical Rigger, job class 7, or below. Waybright testified at trial and the court finds that the Company maintained a policy of totally excluding black employees from the Shop Electrician and Electrical Wireman positions until approximately 1964.

In 1968 the Company initiated, in response to a Labor Department proceeding regarding alleged discriminatory treatment of blacks at the Company's Sparrows Point plant, a program designed to assist employees in obtaining the knowledge necessary to pass the Electrical Helper Test. Prior to this time the Company did not have any training program designed to aid employees in passing the test. Most, but not all, black employees who passed the test did so after completing the pretest training programs, some black employees, including Lewis' brother, having passed the test prior to 1968.

The only direct evidence regarding the differential pass-fail rates of whites and blacks prior to the institution of the training program came from the deposition testimony of Bernard Parrish, an International Staff Representative for Local 2610 since 1964:

"Q Do you have any knowledge of what the experience of blacks have been passing that test prior to 1967?

"A Well, probably by that time, blacks just couldn't pass that test. See, generally, there was no training program at the plant at any time prior to that time to instruct you how to pass the test. It was just not in existence.

\* \* \* \* \* \*

"Q I see. Now, with respect to whites who were passing the tests prior to 1967, do you have any knowledge of that?

"A No, I don't."

(Pl's Ex. 64, at 30–31).

Lewis passed the Electrical Helper Test in May of 1969 after attending the Company's training program and thereby became eligible for "helper" positions, such as Electrical Helper, Shop Helper or Electrical Wireman Helper, where he could receive training for craft and higher paying noncraft positions. Attainment of the craft position of Shop Electrician, one position upon which this litigation has focused, through a progression commencing with the Electrical Helper position, on the average requires five to six years. An employee requires this time to gain the expertise necessary to pass the Craft Determination Test, discussed in greater detail *infra*, which is a test that must be passed to obtain a craft position. Lewis would have had to take a reduction in pay if he had accepted a helper position, since that position has a job class 6 rating and he was working in 1969 as an electrical rigger with a job class 7 rating.[6]

represented as showing the results of all tests taken by Lewis during his employment with the Company.

**6.** The reduction in pay would have been eight cents per hour. Under the terms of Consent Decree I, *United States v. Allegheny Ludlum,*

63 F.R.D. 1 (N.D.Ala.1974), signed in 1974, Lewis could accept a helper position without a reduction in pay.

In an effort to determine job interests among persons graduating from the prehelper program and passing the Electrical or Mechanical Helper Test, J. W. Paul, Jr., at the time the Company's Supervisor of Employment and Training, developed and had distributed among such graduates a job interest survey form. Lewis filled out and signed the job interest survey on May 16, 1969 (Co. Ex. 56), indicating that he had no interest in leaving his present position at the time and that if he decided to consider another position, he would notify his supervisor or the Employment Department. On May 16, 1969, his permanent position was Electrical Rigger, job class 7, and he was working on a temporary basis as Winch Truck Operator, job class 9.

After passing the Electrical Helper Test, Lewis was offered the temporary position of Mechanical Handyman at a job class 9, but he did not accept the position. He believed he had an opportunity to become a permanent Winch Truck Operator at a job class 9 and in a permanent position he would not be as subject to layoff if a work force reduction occurred.

After Lewis turned down the job of Mechanical Handyman, he was also offered opportunities to work in the job of Electrical Helper, or Shop Helper, but Lewis turned them down on the ground that he would have to take a pay cut to job class 6.

The facts which Lewis appears to contend bring the discrimination practiced against him by the Company within the statutory limitations period revolve around six job positions. Those positions are Refrigeration Repairman, Shop Electrician, Welding Machine Repairman, Motor Repairman, Millwright and Motor Inspector. At trial the court granted defendants' motions to dismiss any claim based upon the actions of the defendants regarding the crafting of the positions of Millwright and Motor Inspector.[7]

The facts directly relating to each position upon which Lewis relies are as follows:

1. *Refrigeration Repairman* : In 1969, *after Lewis had passed* the Electrical Helper Test, the Company placed two white employees in this position who were junior to Lewis on the basis that the white employees could perform the work required of the position and Lewis could not. A Company supervisor testified in an arbitration hearing on the grievance submitted by Lewis that Lewis would require five-to-six years of training to perform the job properly. After losing in arbitration, Lewis refused an offer of a position known as Refrigeration Repairman Helper because he would have had to accept a reduction in pay and the Company would not guarantee him that he would receive on the job training as a Refrigeration Repairman.

In 1973 this position was made a craft position and all incumbents in the position were allowed to remain in the position without taking a Craft Determination Test. All the incumbents were white. Unit 438 was the only unit within Department 32 having employees in this position from 1965–1972. (Pl's Ex. 23).

2. *Shop Electrician* : This is a multirated craft position with progression being from grade C through to grade A. Entry into the position at the C level and progression through the grade levels is dependent upon the employee passing certain parts of the six-part Craft Determination Test for this position. The Craft Determination Test for Shop Electrician consists of samples of actual productive work normally done by a Shop Electrician. If the work on which the persons are tested were not done as part of a Craft Determination Test, it would be done by a Shop Electrician as part of his normal duties.

In taking the Craft Determination Test, the employee being tested completes repre-

---

7. In 1965 the Company and the Union agreed to change the multirated noncraft positions of Millwright and Motor Inspector into craft positions and to slot all incumbents of the positions into the positions as craft positions without requiring them to take a Craft Determination Test. Twenty-six white and no black employees were slotted into the craft position. Unit 442 was the only unit within Department 32 having employees in the Millwright position. Units 437, 438, 441 and 442 had employees in the Motor Inspector position.

sentative job assignments within each of six basic areas of work, from the work available in the shop at the time of the testing, which can take as long as two months to complete. The six basic types of work are:

(a) Service, repair and replace all types of sleeve and antifriction bearings.

(b) Overhaul, make, replace and assemble parts of electrical apparatus.

(c) Wire or rewire controllers, panel boards, resistance banks, etc. and other electrical equipment.

(d) Dismantle and assemble all types of A.C. and D.C. motors and generators.

(e) Dismantle and assemble all types of transformers and other electrical equipment.

(f) Check all electrical equipment by means of mechanical and electrical tests.

The individual being tested is exposed to a certain degree of hazard. He is exposed to 440 volts of electricity on certain functions and 250 volts on others, all of which could cause him bodily harm, if he is unqualified, by education, training or otherwise, to work with electrical machinery. After failing a Craft Determination Test, an individual must wait 1,040 working hours before he can be retested. This requirement is by industry-wide contractual agreement. The length of time is one-half of a working year. From 1967 to November, 1973, a total of three blacks were tested for Shop Electrician; one passed and two failed. During the same period 11 whites were tested, five of whom passed and six of whom failed. At trial the court, upon defendants' motion to dismiss, found Lewis to have failed to prove the Craft Determination Test, itself, to be discriminatory; Lewis admitted that the work required of an employee in the position of Shop Electrician and the test are the same. The court also found Lewis to have failed to prove that the test was administered in a racially discriminatory manner.

In December, 1968, prior to his passage of the Electrical Helper Test, Lewis signed a notice indicating a desire to be assigned to a vacancy for this position in Unit 438. After Lewis was told he would have to pass a Craft Determination Test to be assigned the position, he withdrew his request that his qualifications and ability for the position be determined. The position was assigned to a white employee with eight months less seniority than Lewis. The white employee was more qualified to perform the duties of the position because he had received pertinent on-the-job training in other positions. Prior to 1968 only Unit 440 had employees in this position. In February, 1968, two positions within Unit 438 were reclassified and merged into this position, discussed *infra*. (Pl's Ex. 23).

3. *Welding Machine Repairman and Motor Repairman:* In February, 1968, the Company and Union agreed to change these multirated noncraft positions to the craft position of Shop Electrician and to slot all incumbents of these positions into the position of Shop Electrician at the B grade. Thus, none of these employees had to pass the Craft Determination Test to enter this craft. Prior to the crafting of these positions, the incumbent employees had received the training to perform the work required of the position from a senior employee in the position. There were 16 white and one black incumbents in these positions when they were slotted into the Shop Electrician position. The job class of the positions was 7 for C grade, 9 for B grade and 11 for A grade, whereas the Shop Electrician received three classes higher at each grade. Unit 438 was the only unit within Department 32 to have the positions of Welding Machine Repairman and Motor Repairman from 1965 until the positions were eliminated in 1968. (Pl's Ex. 23).

4. *Motor Inspector:* Since Lewis was first promoted to the position of Winch Truck Driver on July 29, 1970, he has been prevented from working overtime as a Winch Truck Driver because Motor Inspectors are given such assignments and Lewis cannot qualify as a Motor Inspector under standards imposed by the Company and Union on December 10, 1965. (This is an attempt by Lewis to demonstrate a nexus between the crafting of the Motor Inspec-

tor position in 1965 and an injury to himself).

The position of Motor Inspector is a craft job throughout the Sparrows Point Plant, including Seniority Department 32, Foster Lewis' department. Motor Inspectors in Department 32, among other things, perform emergency electrical repairs on motors and related electrical work. In Seniority Department 32, throughout the time Lewis worked as a Winch Truck Operator there, one way of obtaining training to learn the skills of a Motor Inspector has been to accept work as a temporary Motor Inspector. Several black employees in Department 32, including Earl Curbeam and W. H. Barnes, obtained such training working as temporary Motor Inspectors. In April of 1970, Jay Williamson, a Labor Foreman in Section 438 and an immediate supervisor of Lewis, offered Lewis an opportunity to work as temporary Motor Inspector during the vacation period that year. This offer was made on the basis of Lewis' seniority. Lewis turned Williamson down, thereby failing to take advantage of the opportunity for on-the-job training for Motor Inspector. (Co. Ex. 103). In April of 1972, Williamson similarly offered Lewis the opportunity to work as a temporary Motor Inspector during the vacation period. Again, Lewis turned Williamson down. (Co. Ex. 104). Lewis did not want to work as temporary Motor Inspector because it would have involved some working at night, and Lewis preferred the daylight shift exclusively.

At trial, Lewis made no showing that he was qualified to perform the duties of Refrigeration Repairman, Shop Electrician, Motor Inspector or any position above that of Winch Truck Driver, job class 9. At trial, Lewis made no showing that within the relevant time period (i.e., from and after September 30, 1967), he applied or attempted to apply for on-the-job or other training in Department 32 for positions for which such training was provided or that the Company followed practices or policies that prevented his receiving notice of such opportunities.

After Lewis passed the Electrical Helper Test on May 16, 1969, he was eligible to fill vacancies in Electrical Helper and other maintenance jobs requiring helper test qualification. Between graduation from the prehelper training program and December 1, 1975, a total of 74 black and 32 white graduates of such programs, unlike Lewis, entered maintenance jobs requiring helper test qualification. Of these, 20 blacks and eight whites had, by December 1, 1975, advanced to permanent craft jobs; 31 blacks and 11 whites had filled temporary craft vacancies. (Co. Ex. 112).

Between June 1, 1969, and December 31, 1973, there were many vacancies at Sparrows Point in Electrical Helper jobs which led directly to the craft job of Motor Inspector, which were posted plant-wide (including Department 32), and which regularly paid higher hourly rates than Lewis' position of Winch Truck Operator. For each of at least 107 of such vacancies Lewis, had he elected to bid for such job, had a greater seniority right thereto than the employee ultimately assigned. Each such job would immediately have paid Lewis more money than he was receiving as winch truck operator (from 16 cents an hour to 54 cents an hour higher at the time of each such vacancy). (Co. Ex. 92).

From and after April 12, 1974, through the date of trial, Lewis had an opportunity, based on his plant seniority, to bid on at least nine electrical helper jobs within Department 32 and to take such jobs without any loss in pay, pursuant to the rate retention provisions of Consent Decree I. Thereafter, pursuant to the seniority provisions of Consent Decree I, Lewis would have been able to accelerate through lines of progression on the basis of his plant service and incumbency status. (Co. Ex. 93). Additional such opportunities existed in other Departments on which Lewis could have bid after April 12, 1974.

Lewis also appears to contend that the seniority and transfer provisions operative at the Sparrows Point Plant from 1962 through to the present are unlawfully discriminatory. Lewis maintains that had he

transferred out of Unit 438 into any other unit in Department 32 his seniority for purposes of promotion, demotion and layoff decisions[8] would measure from the date he first began work in the new unit.[9] The accuracy of this contention depends upon whether each unit in Department 32 was a "seniority unit," or whether Department 32 was a single "seniority unit." The parties are in disagreement on this point.

The Sparrows Point Plant Seniority Pool Agreement between the Company and the Unions, effective October 20, 1963, clearly provides that Department 32 is a single "seniority unit." (Pl's Ex. 1, at ¶ 1a and p. 21). However, two black employees in Department 32 testified regarding their loss of seniority upon transferring between units in Department 32. One of those transfers may have occurred in 1964.

William Pierce, Jr., testified that he lost five years' seniority when he transferred from Unit 443, the electrical construction unit, to Unit 438. Pierce had been hired by the Company in May, 1955, and the transfer apparently occurred in 1960. (Pl's Brief at 12). Robert W. Skates was hired into Unit 443 in April, 1948. The date of his transfer into Unit 438 and the concomitant loss of seniority is, however, unclear:

> "[H]e remained in the material handler position at a job class 4 for *sixteen years* because the company would not allow him to transfer or promote to higher positions because of his race. He testified that when he was able to transfer, it was into the 'Rigging Unit' in Unit 438 as a laborer, and, that he lost *14 years* of seniority and became the junior man in the 'Rigging Unit.'"

(Emphasis supplied) (Pl's Brief at 13).

Chester Haack, a white foreman in Department 32, testified that the Company ceased treating the department as having separate seniority units in 1965 as a result of a grievance being filed with Local 2610. This was two years after the execution of the Seniority Pool Agreement but prior to the limitations period applicable to this action. In his posttrial brief Lewis states that "the department has historically operated as if it was comprised of eight units" and "[t]his information was included in a document signed by twenty-six black employees . . . filed with EEOC on December 28, 1973." (Pl's Brief at 19). At a later point on the same page of his posttrial brief Lewis states, "[he] contends that as late as 1969 a unit seniority system was still being used in department 32." The document filed with the EEOC uses the vague term "historically" in describing the operation of Department 32 as being comprised of seven "seniority units" and it is not clear when, if ever, this treatment was thought by the complaining employees to have ended. The statement in Lewis' posttrial brief regarding the operation of Department 32 through 1969 as being more than one "seniority unit" is not supported by the exhibit (PX 84) cited in support of the statement. The court concludes from the credible evidence that Department 32 has operated as a single "seniority unit" since at least September, 1967. Aside from the alleged loss of "seniority unit" seniority, Lewis does not contend that he could not have transferred to any entry level position in any unit within Department 32 if he had the qualifications for the position.

In regard to the posting of notices of vacancies in Department 32 Lewis, in his proposed Finding of Fact No. 22, states:

> "Since 1958, after a Supervisor fills a vacancy in his unit in department 32, it is first posted in the unit in which it occurs, then on a department-wide basis, then on a plant-wide basis. Prior to that time, vacancies were not posted."

---

**8.** In addition to seniority, the other two factors considered in such decisions were and are "ability to perform the work" and "physical fitness."

**9.** The successive Master Agreements provided for loss of seniority upon transfer between "se- niority units," but Consent Decree I, effective January 1, 1975, would allow Lewis to transfer between "seniority units" without losing seniority. (Pl's Exs. 2C–2F at Art. X, Sec. 12, and Pl. Ex. 3 at ¶ 4(b)).

While that statement is partially correct, the more precisely correct factual statement is that at least since September, 1967, permanent vacancies within Seniority Department 32 have been posted in the Department in accordance with Article X, Section 16 of the Collective Bargaining Agreement (Pl's Ex. 2), which provides that "when a vacancy (other than a temporary vacancy) in any job in a seniority unit shall occur which is to be filled by promotion, the management shall, so far as shall be practicable, post a notice of such vacancy in the department for a period of thirty days." At all times relevant to this case, the practice in Seniority Department 32 with respect to such posting has been for such permanent vacancies to be filled by management on the basis of seniority as defined in Article X, Section 1 of the Collective Bargaining Agreement (length of service, ability to do the work, and physical fitness), and to post a notice of the filling of such vacancies. The notice also states that "any employee who wishes to protest the assignment listed above should do so by notifying his foreman promptly." Such notice is posted for a period of 30 days, during which time any employee wishing to protest the assignment, in accordance with the grievance procedure in the Collective Bargaining Agreement, may do so. (Co. Exs. 100, 101).

B. *Civil Action 70–1127–M—Statistics*

Lewis has attempted to fit the facts allegedly demonstrating the discriminatory treatment he has received into an overall picture of a pattern and practice of discrimination by the Company against blacks. The statistical imbalance demonstrated by Lewis in a comparison of white and black employees is marked in some respects.

Of the 20,490 employees working Production and Maintenance jobs in the Sparrows Point Plant as of November 1, 1967, 12,600 were white, 7,866 were black, and 24 were "other." The average job class of white employees was 9.62 while the average job class of black employees was 5.47. These employees were in 67 seniority departments of which 11 had a nearly equal number of blacks and whites; 32 were 90 percent one race (28 were 90 percent white and four were 90 percent black); 23 were 66⅔ percent one race (20 were 66⅔ percent white and three were 66⅔ percent black). As of January 18, 1969, the average, actual straight-time hourly earnings (including incentive, but not overtime) of white production and maintenance employees at the Plant were $3.798 per hour, while those of black employees were $3.415 per hour.

Based upon a computer printout of a particular week's payroll data for the Company in each year from 1965 through 1972, and other information sources for 1974 and 1976, the court finds that black employees held the following percentage of all noncraft positions with a job class 9 or below and not in a line of progression for craft jobs or noncraft jobs with a job class greater than 9 (positions for which passage of the Electrical Helper Test was not a prerequisite), in Unit 438:

| Year: | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1974 | 1976 |
|---|---|---|---|---|---|---|---|---|---|---|
| Percentage: | 90 | 94 | 87 | 81 | 83 | 86 | 81 | 80 | 86 | 85 |

The percentage of employees in Unit 438 who were black during the years 1965–1972 were as follows:

| Year: | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 |
|---|---|---|---|---|---|---|---|---|
| Percentage: | 32 | 28 | 32 | 28 | 37 | 39 | 32 | 31 |

The disparity in the status of black and white employees is as marked when viewed on the departmental level. The percentage of black employees in Department 32 holding positions with job class 9 or below in each year analyzed stands in stark contrast to the percentage of white employees in Department 32 holding positions with a job class 9 or below:

| Year: | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1974 | 1976 |
|---|---|---|---|---|---|---|---|---|---|---|
| % Black: | 94 | 94 | 93 | 88 | 92 | 87 | 76 | 80 | 76 | 76 |
| % White: | 36 | 33 | 30 | 31 | 27 | 26 | 27 | 24 | 19 | 14 |

Additionally, a much higher percentage of whites than blacks in positions with a class 9 or below were in entry level positions which lead to higher paying jobs.

There have never been more than two black supervisors in Department 32 and they supervised black employees in the jobs with job classes 9 or below and not in a line of progression for higher paying jobs.

Despite the continuing statistical imbalance between the status of whites and blacks in Unit 438 and Department 32, there is statistical evidence that the status of blacks has been improving. The following table shows the percentage of blacks and their absolute number (in parentheses) in positions which require passage of the Electrical Helper Test:

| Year: | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 |
|---|---|---|---|---|---|---|---|---|
| Percentage: | | | | | | | | |
| Unit 438 | 9.5(7) | 11(7) | 15(12) | 16(12) | 20(16) | 23(19) | 28(17) | 16(7) |
| Dept. 32 | 11.5(10) | 14(11) | 18.5(18) | 26(25) | 26(28) | 36(43) | 41(38) | 41(29) |

(Pl's Ex. 23).

### C. *Civil Action 70–1127–M—The Unions' Actions*

The Union negotiated an agreement with the Company in 1968 which required that all tests given by the Company be job related. As defined in the contract, a job related test is "one which measures whether an employee can satisfactorily meet the specific requirements of that job including the ability to absorb any training which may necessarily be provided for that job." (Pl's Ex. 2D, p. 114). In addition the contract provided:

"(a) Tests shall be fair in their makeup and in their administration;

"(b) Tests shall be free of cultural, racial or ethnic bias; and,

"(c) Testing procedures shall include procedures for notifying an Employee of his deficiencies and offering counseling as to how he may overcome them."

(Pl's Ex. 2D, p. 115). These contractual provisions have been in every contract between the Union and the Company since 1968. (Pl's Exs. 2E at 122–123 and 2F at 126–127).

The Union has never conducted any studies to determine the job relatedness of a test used by the Company.

The facts upon which Lewis relies to prove his claim that the Unions have failed in their duty to give "fair representation" to their members revolve around Lewis' December, 1968, notification to the Company indicating a desire to be assigned to a vacancy in a Shop Electrician position. *See supra* at 957. As detailed *supra*, Lewis withdrew his request after being told he would have to take a Craft Determination Test. The position was eventually assigned to a white employee with less unit or plant service seniority than Lewis.

In June, 1969, Lewis filed a grievance with Local 2610 charging that he did not have the necessary experience to take or pass the Craft Determination Test because, due to his race, he had been denied the opportunity to be placed in positions where he would receive such experience. Local 2610, acting through the Plant Grievance Committee, rejected Lewis' grievance at the third step of the procedure. The ostensible reasons given for the rejection were Lewis' withdrawal of his request to take the Craft Determination Test and the lack of racial discrimination in the Company's actions. Significantly, the Union does not participate in any manner in a grievance proceeding until the fourth step.

In 1968, Local 2610 accepted a group grievance from eight white and one black Shop Electricians at the B grade charging that the Craft Determination Test was not job related and that they were not being given the training necessary to pass the portion of the test for promotion to the A grade. The Union joined with Local 2610 in processing the grievance through arbitration. A reading of the Union's brief submitted to the Impartial Umpire and the Umpire's decision demonstrates that the employees' grievance against the Company was aimed at the Company's practice of not assigning these Shop Electricians the type of work (panel work) which was covered in the portion of the test which they needed to pass in order to achieve the "A" grade. (Pl's Ex. 44). Without being assigned this type of work, the Shop Electricians could not obtain the on-the-job training necessary to learn the work. Thus, the grievance claims that the test was not job related and that they were being improperly denied the necessary training to pass the test expressed, in two different forms, their dissatisfaction with a single Company practice.

The Union's theory in contesting the practice was grounded in a contract provision. Specifically, the Unions argued that the provision of the collective bargaining agreement guaranteeing craftsmen the opportunity to be tested every 1,040 work hours to determine if "satisfactory qualifications and ability have been developed" to upgrade implies that the opportunity to receive the necessary training would be provided. (Pl's Ex. 44, Umpire's Decision at 2). The Umpire found the Company not to have an obligation to provide the necessary training. *Id.* at 3.

### D. *Civil Action M–75–1536—General Factual Findings*

The court has considered the evidence relating to Lewis' claim of retaliation in Civil Action M–75–1536. Without detailing all the evidence, it is sufficient to say that the court concludes that Lewis introduced insufficient credible evidence at trial to support his claim in Civil Action M–75–1536

that with respect to the Company, "the defendants refuse to accept plaintiff's grievances on the same basis that white employees' grievances are accepted." Lewis' general foreman, Chester Haack, testified without contradiction that he processed employee grievances in the same manner for all employees. As well, Lewis introduced no credible evidence at trial to support his claim in Civil Action M–75–1536 that, with respect to the Company, "the defendants allow less senior white employees to bump plaintiff out of his regular job as a Winch Truck Operator in times of layoff." When force reductions in the Electrical Repair Shop caused the discontinuance of one of the two winch trucks, the person who remained as the Winch Truck Operator was a black employee senior to Lewis, Melvin Graves. Lewis introduced insufficient credible evidence at trial to support his claim in Civil Action M–75–1536 that the Company retaliated against him for filing complaints of racial discrimination with the Equal Employment Opportunity Commission. Both Lewis' labor foreman, Jay Williamson, and his general foreman, Chester Haack, testified to the contrary and the court finds their testimony in that regard to be generally credible.

In addition, Foster Lewis did not introduce sufficient credible evidence to show that Local 2610 failed to process his grievances or took any other action in retaliation for his filing of an EEOC charge in January, 1969, or his filing of Civil Action 70–1127–M. As a matter of fact, of the 39 grievances processed on behalf of Lewis, 23 were after January, 1969. (U's Ex. 116(c)).

## DISCUSSION

### A. *Distinction Between Title VII and § 1981*

The resolution of this case might be a much simpler task if both the Company and Unions were sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* However, as noted earlier, by pretrial stipulation the parties agreed that in Civil Action 70–1127–M the court did not have jurisdiction over the Company under

Title VII but only under 42 U.S.C. § 1981 and the Labor Management Relations Act of 1947, 29 U.S.C. §§ 151 *et seq.* Recent Supreme Court decisions indicate that the standard for proving unlawful racial discrimination under Title VII and § 1981 are significantly different.

*Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), was a Title VII case concerning the legality of an employer's requirement that an employee have a high school education or pass two general intelligence tests in order to work in any department except the one traditionally worked by blacks. In finding the employer's requirements to be unlawful, the Supreme Court enunciated a legal standard directly applicable to Title VII cases:

"The Court of Appeals held that the Company had adopted the diploma and test requirements without any 'intention to discriminate against Negro employees.' 420 F.2d [1225] at 1232 [4 Cir.]. We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability.

"The Company's lack of discriminatory intent is suggested by special efforts to help the undereducated employees through Company financing of two-thirds the cost of tuition for high school training. But Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question."

401 U.S. at 432, 91 S.Ct. at 854. *Accord, Albemarle Paper Co. v. Moody,* 422 U.S. 405, 422, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

On the other hand, the recent Supreme Court decisions in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), hold that a discriminatory intent on the part of the defendant, while not necessary to be present in a Title VII case, is a necessary element of proof of unlawful racial discrimination where the plaintiff is proceeding under 42 U.S.C. § 1983. Lower court decisions do not agree on whether § 1981 requires discriminatory intent as in § 1983 or merely discriminatory impact as in Title VII. *See Woods v. City of Saginaw,* 13 E.P.D. ¶ 11,299 (E.D.Mich.1976); *Johnson v. Hoffman,* 424 F.Supp. 490 (E.D. Mo.1977). For the reasons outlined here, this court believes that under § 1981, as under § 1983, plaintiffs must prove discriminatory motive or intent.

*Village of Arlington Heights;*[10] *Mt. Healthy;* and *Washington v. Davis*[11] dis-

---

**10.** Although the complaint in *Village of Arlington Heights* contained a count based on 42 U.S.C. § 1981, *see* 373 F.Supp. 208, 209 (N.D.Ill. 1974), and 517 F.2d 409, 411 (7th Cir. 1975), neither the U.S. District Court, the U.S. Court of Appeals, nor the U.S. Supreme Court discussed the impact of that count on the ultimate outcome of the case, each Court, *sub silentio,* limiting its expressed reasoning in the Constitutional arena to the application of the Fourteenth Amendment to the facts of the case.

**11.** The complaint in *Washington v. Davis* also contained a count based upon 42 U.S.C. § 1981, 426·U.S. 229 at 233, 96 S.Ct. 2040, 48 L.Ed.2d 597. It is unclear from the Court's opinion whether Part III thereof was intended to en-

compass a discussion of § 1981 in relation to the concept of job relatedness of tests which are prerequisites to training. Mr. Justice Stevens, concurring, felt it was, 426 U.S. at 255, 96 S.Ct. 2040, while Justices Brennan and Marshall, in dissent, seemed to believe that Part III of the opinion dealt only with the extent to which the job-relatedness standards of 5 U.S.C. § 3304 and of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* are synonymous, *Id.* at 257–258, 96 S.Ct. 2040. Admittedly more intuitively than analytically, this court believes that Part III of the majority opinion in *Washington v. Davis* did not consciously consider the § 1981 claim in the case as one advancing "statutory grounds" for relief, but, instead, without discussion treated the § 1981

cuss the elements of proof necessary to establish a constitutional violation of the Fourteenth Amendment's Equal Protection Clause (*Village of Arlington Heights* and *Mt. Healthy*) or of the "equal protection component" of the Fifth Amendment's Due Process Clause (*Davis*, 426 U.S. at 239, 96 S.Ct. 2040); then they hold that proof of intent is necessary to establish a violation of the equal protection of the law guaranteed by the Fourteenth Amendment and § 1983 on the one hand and by the Fifth Amendment on the other.

 There is, of course, a difference between § 1981 and § 1983. *See Raffety v. Prince George's County*, 423 F.Supp. 1045, 1059–1061 (D.Md.1976). Unlike § 1983, which is based upon the Fourteenth Amendment, § 1981 is based upon the Thirteenth Amendment and, like § 1982, was originally enacted in the Civil Rights Act of 1866. On its face, the Thirteenth Amendment abolished slavery. However, section 2 of the Amendment, the Enabling Clause, empowered Congress "to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *Civil Rights Cases*, 109 U.S. 3, 20, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883). Accordingly, Congress has the power "rationally [to] determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 at 440, 88 S.Ct. 2186, at 2203, 20 L.Ed.2d 1189 (1968). Undeniably, Congress could have provided for the establishment of a § 1981 claim upon proof of discriminatory impact or effect alone. *Cf.* Fourteenth Amendment, section 5; *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453 n. 9, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Jones v. Mayer Co.*, 392 U.S. at 439, 88 S.Ct. 2186; *District of Columbia v. Carter*, 409 U.S. 418, 424 n. 8, 93 S.Ct. 602, 34 L.Ed.2d 613. To determine if Congress did so, one must examine the language and history of the statue. When the Supreme Court tangentially

reviewed the legislative history of § 1981 by reviewing the legislative history of its sister provision, § 1982, the Court did not advance evidence of explicit Congressional statements delineating the specific elements of proof necessary to establish a violation of either § 1981 or § 1982. *See Jones v. Mayer Co., supra*, where the issue was whether § 1982 applied to private actions as well as to governmental action. Prior to examining the legislative history of § 1982, however the Court looked at the plain words of the statute. The Court's statements regarding the meaning of those words are relevant for the present determination as to elements of proof of a cause of action under § 1981:

"We begin with the language of the statute itself. In plain and unambiguous terms, § 1982 grants to all citizens, without regard to race or color, 'the same right' to purchase and lease property 'as is enjoyed by white citizens.' . . .

"On its face, therefore, § 1982 appears to prohibit *all* discrimination against Negroes in the sale or rental of property—discrimination by private owners as well as discrimination by public authorities. Indeed, even the respondents seem to concede that, if § 1982 'means what it says'—to use the words of the respondents' brief—then it must encompass every racially *motivated* refusal to sell or rent and cannot be confined to officially sanctioned segregation in housing. . . ."

"Hence the structure of the 1866 Act, as well as its language, points to the conclusion urged by the petitioners in this case—that § 1 was meant to prohibit *all* racially *motivated* deprivations of the rights enumerated in the statute, although only those deprivations perpetrated 'under color of law' were to be criminally punishable under § 2."

392 U.S. at 419–422, 426, 88 S.Ct. at 2193–2196 (emphasis added to "motivated"). The quoted and emphasized language may be only dicta as to the precise issue of the

claim against the governmental body as having been resolved by the same Constitutional requirement of intention to discriminate as the

claim under the equal protection component of the Due Process Clause of the Fifth Amendment.

necessity for "discriminatory intent," but it is an expression of the Court's reading of the statute. Section 1981 contains the same operative terms as § 1982 in that it guarantees "*[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.*" 42 U.S.C. § 1981 (emphasis added).[12] For both § 1981 and § 1982 the same operative terms (the emphasized language) were taken verbatim from the original text of section 1 of the Civil Rights Act of 1866. *See Jones v. Mayer Co.*, 392 U.S. at 422, 88 S.Ct. 2186; *Tillman v. Wheaton-Haven Rec. Ass'n*, 410 U.S. 431, 439, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973).

█ The Supreme Court's reading of the operative terms found in §§ 1981 and 1982 to require discriminatory "motivation" takes on greater significance when the analysis of the Court in *Washington v. Davis* is applied to the present issue. After reviewing prior precedent, which admittedly was not clear, the Court turned its attention to the operative words of the Constitution under discussion, examined those words standing alone and compared their simple mandate to Title VII:

"As an initial matter, we have difficulty understanding how a law establishing a racially neutral qualification for employment is nevertheless racially discriminatory and denied 'any person . . . equal protection of the laws' simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups. . . .

"Under Title VII, Congress provided that when hiring and promotion practices disqualifying substantially disproportionate numbers of blacks are challenged, discriminatory purpose need not be proved, and that it is an insufficient response to demonstrate some rational basis for the challenged practices. It is necessary, in addition, that they be 'validated' in terms of job performance in any one of several ways, perhaps by ascertaining the minimum skill, ability or potential necessary for the position at issue and determining whether the qualifying tests are appropriate for the selection of qualified applicants for the job in question. However, this process proceeds, it involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution where special racial impact, without discriminatory purpose, is claimed. We are not disposed to adopt this more rigorous standard for the purposes of applying the Fifth and the Fourteenth Amendments in cases such as this."

426 U.S. at 245–248, 96 S.Ct. at 2050–2051.

The similarities in the operative statutory language of § 1981 and § 1982, the apparent requirement seen by the Supreme Court of a racially discriminatory motivation in order to establish a violation of § 1982, and the common thread of the enforcement of racial neutrality in official acts pursuant to the Fifth and Fourteenth Amendments and in the enumerated private and official acts pursuant to §§ 1981 and 1982, convince this court that under § 1981, as under § 1983, proof of discriminatory motive and intent is required.

Possibly of greater significance than the parallel language of the Constitution and § 1981 is the dissimilarity of the language and legislative history of § 1981 and Title VII. *Compare Jones v. Mayer Co., supra*, 392 U.S. at 422–437, 88 S.Ct. 2186 with *Griggs v. Duke Power Co., supra*, 401 U.S. at 430–436, 91 S.Ct. 849. In 1866 Congress was understandably focused upon overt dis-

---

12. Section 1981 reads:

"All persons within the jurisdiction of the United States shall have the *same right* in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the *full and equal benefit of all laws* and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Section 1982 reads:

"All citizens of the United States shall have *the same right*, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property."

(Emphasis supplied).

crimination. The broad language of § 1981 stands in stark contrast to the sophisticated, detailed provisions of Title VII, enacted in 1964 and directed specifically to employment. In *Griggs*, the Court could specify language of the Act and the legislative history which supported a determination that discriminatory intent was not a necessary element to a cause of action under Title VII. 401 U.S. at 430–436, 91 S.Ct. 849. That cannot be done for § 1981.

## B. The Role of Proof of Discriminatory Intent in § 1981 Actions

In *Village of Arlington Heights v. Metropolitan Housing Development Corp. supra,* and *Mt. Healthy City School District v. Doyle, supra,* the Court expanded upon the part played by "intent" in proving discrimination and possible defenses to prove that discriminatory intent was a motivating factor in the action taken. Those decisions also reveal what the Court considers to be proof of discriminatory intent.

■ It is not necessary for a plaintiff to prove "that the challenged action rested solely on racially discriminatory purposes." *Village of Arlington Heights, supra,* 429 U.S. at 265, 97 S.Ct. at 563. All that is necessary is proof that a discriminatory purpose has been a motivating factor behind the injurious action. *Id.*

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266, 97 S.Ct. at 564. Notably, racially different impact "may provide an important starting point" particularly if "unexplainable on grounds other than race." *Id.* The historical events leading up to and surrounding the challenged action may be revealing. Obviously, any contemporary statements by agents of the defendant evidencing an intent to discriminate against blacks via the challenged action would be highly probative.

■ If a plaintiff sustains his burden of proving racial discrimination to have been a motivating factor behind the challenged action, the inquiry does not end. Rather, such proof shifts to the defendant the burden of establishing that the same action would have been taken even had the unlawful purpose not been a motivating factor. *Mt. Healthy City School District, supra,* 429 U.S. at 287, 97 S.Ct. 568; *Village of Arlington Heights, supra,* 429 U.S. at 270–271, n. 21, 97 S.Ct. 555. For if the defendants are able to prove this, the plaintiff cannot attribute the injury for which he seeks redress to racial discrimination. *Id.*

## C. Civil Action 70–1127–M—The Case Against The Company Under § 1981

Proceeding to the application of the aforegoing legal principles to the specific discrete events of which Lewis complains in Civil Action 70–1127–M, the court notes that Lewis does not seem to contend that he was or is qualified to perform the work of the presently existing jobs of Shop Electrician, Refrigeration Repairman or Motor Inspector. Instead, he claims "that he would have been qualified for the positions but for past racially discriminatory practices of the defendants which prevented him from gaining the necessary qualifications for the jobs he applied for . . . ."[13] and "that past racially discriminatory policies and practices of the defendants in the past are perpetuated by present policies and practices of the defendants which prevent him from being promoted." (Pl's Post-Trial Brief, pp. 3–4).

There is some confusion in the court's mind as to what constitutes the present policies and practices of the Company which Lewis contends perpetuate the effects of past discrimination. They apparently are:

(1) Failing to provide "on the job training" to blacks for craft positions;

(2) Failing to post job vacancies prior to the vacancies being filled;

(3) Requiring a Craft Determination Test to be passed for craft positions;

---

**13.** *I. e.* Shop Electrician in 1968 and Refrigeration Repairman in 1969.

(4) Having seniority units smaller in size than the Department; [14]

(5) Requiring the passage of the Electrical Helper Test as a prerequisite to certain jobs;

(6) Slotting the incumbent Welding Machine Repairman and Motor Repairmen into the craft position of Shop Electrician in February, 1968;

(7) Making the position of Refrigeration Repairman a craft in 1973 when it had previously been a noncraft job.

The court has concluded that Lewis was the victim of intentional racial discrimination by the Company on one or more dates prior to September, 1967, at least in the following respects: (1) he was assigned on the basis of his race to an all black unit which had no opportunity for advancement into positions carrying a job class greater than job class 9, (2) he was denied the opportunity prior to 1960 of taking the Electrical Helpers Test since the "electrical bench" was denied to blacks, and (3) he was not provided the opportunities provided generally to whites to learn a craft by serving as a helper. Any cause of action by Lewis under § 1981 directly based upon those acts of the Company is barred, however, by the statute of limitations. In order for Lewis to succeed here against the Company under § 1981, he must prove the existence of a post-limitations period restriction or inhibition upon advancement which perpetuates the effects of the pre-limitations period discrimination. The offending post-limitations period restriction or inhibition upon advancement must itself, under § 1981, be the result of discriminatory intent or motivation on the part of the Company or its agents.

As to the § 1981 aspects of this case, it is at times useful to break the analysis down into the different time frames involved. The first relevant time frame is that period of time prior to September 30, 1967, the beginning of the relevant liability period under the statute of limitations. The

second relevant time frame is the period between September 30 1967, and May 16, 1969, the date on which Foster Lewis passed the electrical helpers' test. The third time frame is from May 16, 1969, until September 30, 1970, the date this suit was instituted. The fourth relevant time frame is from September 30, 1970, through the period when evidence was taken in this case in the summer of 1976.

1. *Alleged Failure of the Company to Provide "On the Job Training" to Blacks for Craft Positions*

While plaintiff has conceded that he was not qualified for the position of Shop Electrician, Refrigeration Repairman or Motor Inspector, he claims with some justification that his pre-September 30, 1967, lack of qualification was at least partially a result of discriminatory employment practices by the defendant company, acquiesced in by the unions. He asserts that the pre-September 30, 1967, discriminatory action, coupled with alleged failure by the Company to provide "on the job" training thereafter, has perpetuated the effects of discrimination.

■ The pre-limitations acts of discrimination are time barred. As to subsequent periods of time, § 1981 does not ordinarily impose an obligation upon employers to take affirmative action in hiring and training minority employees. *Long v. Ford Motor Company*, 496 F.2d 500 (6th Cir. 1974). In *Long v. Ford Motor Company, supra,* Judge Celebrezze noted at 505:

"§ 1981 is by its very terms . . . not an affirmative action program. It is an equalizing provision, seeking to ensure that rights do not vary according to race. It does not require that persons be accorded preferential treatment because of their race."

In order for plaintiff to recover on the theory that he was denied training, he would be required to show that any alleged failure on the part of the company to pro-

14. Although the plaintiff sought to make the seniority practices affecting jobs outside Department 32 an issue in this case, the court ruled that such matters were outside of the issues raised by the pleadings and the Pre-Trial Order.

vide him with "on the job" training constituted intentionally dissimilar treatment from the training opportunities which whites received after September 30, 1967, or constituted treatment which, while similar on its face, was intentionally dissimilar in its effect upon blacks.

There is no credible evidence from which the court can conclude that on the job training opportunities were provided by the Company to white employees and denied to similarly situated black employees subsequent to September 30, 1967. Since 1953 employees who have wished electrical helper positions have been required to pass the electrical helpers test. The legal effect of that test will be discussed *infra*. Subsequent to May 16, 1969, when Foster Lewis passed the electrical helpers test, he turned down the opportunity to obtain helper positions in which he might have received "on the job" training.

Even the position of electrical or other helper has never guaranteed that a person occupying that position will receive on the job training. If an individual helper happens to be working with a journeyman who is willing to show the helper how to perform the work, the helper would have the opportunity to learn the work, but, if not, the helper would learn nothing except that which he picks up on his own or which he learns by taking outside courses on his own time and at his own expense.

2. *Alleged Failure to Post Job Vacancies Prior to the Vacancies Being Filled*

The *sine qua non* of employment discrimination cases is that an otherwise qualified person has been denied a job opportunity or emolument on a racially discriminatory basis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff, it has been amply demonstrated, has failed to prove that he was qualified for any job for which he would have made application if it had been posted prior to the job being tentatively filled. In fact, it was conceded that the plaintiff was not so qualified. Under those circumstances, even if

the posting system had been discriminatory, the plaintiff was not injured, because he was not qualified and would not have been hired in any event. *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 403–404 n. 9, 97 S.Ct. 1891, 52 L.Ed.2d 453, n. 9 (1977); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 369 n. 53, 97 S.Ct. 1843, 52 L.Ed.2d 396, n. 53 (1977); *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 285–287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In any event, the court finds that the posting procedures in effect in seniority Department 32 since at least September, 1967, are not discriminatory and do not, in either theory or practice, inhibit or prevent qualified blacks from exercising their seniority rights to jobs for which they are qualified.

3. *Requirement of a Craft Determination Test to be Passed for Craft Positions*

The position of shop electrician has existed as a craft position at Sparrows Point since approximately 1947. A craft determination test has been required since that time. As previously noted, the court, based upon the evidence and stipulations, has found that the test is nondiscriminatory, the test being, as it is, samples of actual productive work which would be done by the person occupying such a craft job.

The craft determination test for shop electricians has been required since approximately 1947. It was stipulated that from 1967 to November, 1973, a total of three blacks were tested for shop electricians of whom one passed and two failed. During the same period 11 whites were tested, five of whom passed and six of whom failed.

The plaintiff was admittedly not qualified to do the work of a shop electrician. There was no proof that the test had disparate effects upon blacks. Even if such an impact had been established, the craft determination test was, as the court held during trial, job related. As well, there was no credible evidence that the policy, requiring persons who seek to do the dangerous and

difficult work of a shop electrician to take a craft determination test consisting of actual work samples, was the product of intentional discrimination nor that it resulted in unintentional discriminatory effect.

 The same conclusions apply to the other crafts for which craft determination tests were required. In this individual, nonclass action case, Foster Lewis did not have standing, in any event, to challenge the other craft determination tests as to which there was no showing that he either failed a test or was deterred from taking the same. *See Blanks v. Register*, 493 F.2d 697 (4th Cir. 1974), *cert. denied*, 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 68 (1974); *Booth v. Prince George's County, Maryland*, 66 F.R.D. 466, 472 (D.Md.1975).

The effect of slotting certain noncraft positions into the craft position of shop electrician in 1968 will be examined *infra*.

### 4. Alleged Existence of Seniority Units Smaller in Size than the Department

The court has concluded as a fact that Department 32 has operated as a "Seniority Unit" since at least September, 1967. Accordingly, there is no merit to the plaintiff's position that a company policy of having seniority units smaller than the department deterred or precluded him from competing with whites who had less department seniority than he for any position for which he was qualified within the department.

### 5. The Requirement of Passage of the Electrical Helper Test as the Prerequisite to Certain Jobs

As previously stated, the plaintiff's main contention is that he was not afforded opportunities for training that were available to similarly situated white employees. His contention has primarily been that he was precluded from obtaining training opportunities provided by the position of electrical helper, the entry level job for positions in

seniority Department 32 involving electrical or electro-mechanical skills.

Within both Unit 438 and Department 32, during the period that Lewis has been employed there, there have been many higher paying jobs to which he might have advanced if he had passed the electrical helper test.[15]

There is no evidence indicating, and Lewis does not contend, that white employees in Department 32 have been allowed to enter positions leading to the higher paying noncraft and craft jobs without passing the electrical helper test since the test was instituted in 1953, two years before Lewis was first hired by the Company. Although prior to 1960 the Company precluded blacks from taking the test and, as a matter of policy, prior to 1964 probably excluded blacks from the higher paying craft and noncraft positions, Lewis does not contend, and there is no evidence, that after 1964 the Company discriminated against blacks in denying him the opportunity to take the test, or in the awarding of entry level positions upon passage of the test. Furthermore, there is no evidence of discrimination after 1964 in the awarding of promotions to higher paying noncraft jobs after service in an entry level position or in allowing employees to take the various craft determination tests. Thus, any impediment to advancement by Lewis, other than passage of the electrical helper test, was removed no later than 1964, three years prior to the beginning of the limitations period.

 Although it is somewhat ironic, the one salient fact demonstrating the Company's lack of racially discriminatory intent, in establishing and utilizing the electric helper test as a prerequisite for the position of electrical helper which provided the possibility of on the job training leading to higher paying jobs in Department 32, is the Company's refusal to allow blacks to take the test until March, 1960, seven years after the test requirement was instituted. *See*

---

**15.** The positions for which Lewis applied and was rejected, shop electrician and refrigeration repairman, were both in Unit 438.

*Griggs v. Duke Power Company,* 420 F.2d 1225, 1232 (4th Cir. 1970).[16]

This court has found that the reason in 1953 for instituting the test was to identify persons capable of learning skills in the electrical and electro-mechanical maintenance work.

■ Although the Company was not motivated by a racially discriminatory intent in instituting the electrical helpers test at a time when blacks were not allowed, as a matter of policy, to take the test, such a finding does not end the inquiry. The facts are that the Company continued to utilize the electrical helpers test after Lewis and the other 13 members of the first group of blacks who took the test failed it. The test remained as a barrier for advancement for Lewis and the other blacks in the lower paying jobs in Unit 438 and in Department 32. A question arises, therefore, as to whether the Company's retention and continuation of the electrical helpers test rested, in part, upon a racially discriminatory motive. The disparate impact, if any, of a test is often a highly relevant fact in determining whether or not the test was a product of a racially discriminatory intent. *Village of Arlington Heights, supra,* 429 U.S. at 266, 97 S.Ct. 555; *Washington v. Davis, supra,* 426 U.S. at 242, 96 S.Ct. 2040. A key fact in determining whether or not there was actionable racial discrimination by the Company is the disparate impact, if any, of the electrical helpers test.

Lewis has failed, however, to produce any but the most general evidence regarding the possible disparate impact of the electrical helpers test upon blacks.[17] The deposition testimony of Bernard Parrish to the effect that "Blacks just couldn't pass [the] test" prior to the Company's offering a program in 1968 to educate employees in the areas tested was clearly an overstatement. The evidence demonstrated that blacks were passing the test at least as early as 1964. By 1965, 9.5% of the blacks in Unit 438 (seven employees) and 11.5% of the blacks in Department 32 (10 employees) held jobs for which passage of the electrical helpers' test was a prerequisite. The percentage of blacks within the unit and the department holding such jobs increased steadily from 1965 forward. Parrish further testified that he had no knowledge regarding the passage rate of whites taking the test.

Other than the deposition of Parrish, there is no direct evidence of the pass-fail rates of blacks or whites taking the test. The plaintiff appears to contend that the testimony of Parrish in conjunction with statistics showing that blacks have held the great majority of nontest positions establishes that blacks have a more difficult time passing than did whites. This appears to be

---

**16.** In *Griggs,* the Fourth Circuit read Title VII to require a condition for promotion be adopted by the employer with an intent to discriminate against blacks in order for the condition to be a violation of Title VII. The condition at issue, a high school diploma or its equivalent, or passage of two aptitude tests, was adopted 10 years prior to passage of Title VII and at a time when the employer would not allow blacks to hold any of the positions for which satisfaction of the requirements was necessary. The Fourth Circuit found this fact to be a significant factor in concluding that the condition for promotion was not instituted to serve a racially discriminatory intent. The Supreme Court, in overruling the Fourth Circuit's determination that the employer's intent is the issue in a Title VII case, 401 U.S. at 432, 91 S.Ct. 849, did not affect the validity of the Fourth Circuit's factual analysis or the applicability of that analysis to the present case, where, in the § 1981 cause of action, discriminatory intent is the issue.

**17.** Although there was some suggestion at final argument that the Company had improperly failed to furnish to the plaintiff in the discovery process information in its possession by which the plaintiff could have generated statistics showing the pass-fail rates of whites and blacks, subsequent letters (Paper Nos. 107, 108, 109) filed by counsel at the court's direction demonstrated that the plaintiff had the opportunity to obtain the information from which to generate such statistics if he had chosen so to do. The omission of Foster Lewis, and apparently others, from a list furnished by the Company of names of whites and blacks who had taken the electrical helpers test (Exh. 1 to Pl's Ex. 64), which omissions was known to plaintiff's counsel since at least October 23, 1973, was evidently not pursued by the plaintiff, and the court cannot speculate as to its significance, if any.

more speculation than logic. Lewis himself passed the test in 1969, yet has chosen to remain in a position for which the test is not a prerequisite.

The plaintiff cites two cases in support of his argued conclusion that the evidence establishes that the electrical helpers test had a disparate impact on blacks, *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377 (4th Cir. 1972), and *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5th Cir. 1976). Neither case supports the proposition for which it is cited.

In *Brown*, a case not involving a test or similar barrier to promotion, the court stated:

> "Here, *in the absence of objective criteria applied to all workers alike*, the statistics indicate that race is the only identifiable factor explaining the disparity between the jobs held by white employees and those held by black employees. The proof discloses no objective standards based on education, experience, ability, length of service, reliability, or aptitude to account for the preferential employment of white workers." 457 F.2d at 1383. (Emphasis added).

In *Watkins*, it was "virtually undenied" that two of the pertinent tests had a disparate impact upon blacks since the tests were standardized ones which had been found to have a disparate impact on blacks "in a number of other Title VII cases." 530 F.2d at 1185. As to an additional test at issue in *Watkins*, the Circuit Court remanded to receive further evidence as to post-trial test results. The District Court had found that the plaintiff failed to establish that the test had a disparate impact upon blacks. At the time of trial, only seven blacks had taken the test and two had passed for a 28.6% passage rate. Sixty-one whites had taken the test; 24 passed for a 35.3% passage rate. The District Court found the differing percentages to be inconclusive in the absence of evidence of cultural bias in the test.

Having concluded that the plaintiff has not met the burden of proving by a preponderance of the evidence that the Company continued using the test after 1960, when blacks were allowed to take it, or after September, 1967, to carry out a racially discriminatory purpose, the court is of the view that the inquiry in the § 1981 case on the issue of the electrical helpers test should be at an end.

■ But even if racially discriminatory motive or intent were not required, the plaintiff still could not prevail on the issue of the electrical helpers test. Since Foster Lewis took the electrical helpers test in May, 1969, and passed it, he cannot claim to be injured by any racially disparate effect of the test after that date. Furthermore, between September 30, 1967, and the date when Foster Lewis passed the electrical helpers test, the court finds as a fact that he was not deterred from taking the test because of any perceived racially disparate effect of that test. He knew that a number of blacks had taken the test and passed it between 1964 and September, 1967, including his own brother in 1964.

■ Although the statistical evidence presented by Lewis demonstrating a significant difference between the status of whites and blacks on Department 32, together with other evidence, establishes a pattern of racial discrimination by the Company at some time prior to the beginning of the limitations period in this case, such evidence does not establish that Foster Lewis was himself discriminated against after 1967. As noted in *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 805, n. 19, 93 S.Ct. 1817, and *Roman v. E.S.B., Inc.*, 550 F.2d 1343 (4th Cir. 1976), such statistics are accorded their greatest weight when, unlike the present case, the individual's lack of advancement is not attributable to an objective requirement for advancement. Here, after 1964, the barrier which prevented Lewis from qualifying for jobs possessing the possibility for "on the job" training, in turn leading to higher paying jobs, was the fact that he had not passed the electrical helpers test, an objective criterion. Furthermore, since 1965 a steadily increasing percentage of blacks in Unit 438 and in

Department 32 have held positions requiring passage of the test.

The position of electrical helper did have training potential and this potential was available to all employees, regardless of race, who passed the electrical helpers test in 1964 and thereafter. Defendant corporation was under no obligation to provide other specially tailored training opportunities for Foster Lewis. From September 30, 1967, until May 16, 1969, plaintiff did not attempt to avail himself of that opportunity which was available to him. He has not demonstrated that the test itself was unlawfully discriminatory nor that he was injured by it, even assuming it to be unlawfully discriminatory.

6. *The "Slotting" of Incumbent Welding Machine Repairmen and Motor Repairmen into the Craft Position of Shop Electrician in February, 1968*

 Lewis has contended that the slotting in 1968 of incumbent motor repairmen and welding machine repairmen into the shop electrician "B" position in February, 1968, is a policy which perpetuated the effects of past discrimination. His contention appears to be that subsequent to the slotting action in February, 1968, he faced more stringent qualifying conditions for becoming a shop electrician than did those white employees who were slotted into the shop electrician "B" position from the positions of welding machine repairman and motor repairman. This could at best be unlawfully discriminatory only if it perpetuated past unlawful discrimination, there being no indication that the slotting itself was motivated by a discriminatory purpose.[18] *Griggs v. Duke Power Company*, 420 F.2d at 1230–1231 (4th Cir. 1970). Lewis concedes this much (Pl's Post-Trial Brief, pp. 28–30).

The reason Lewis did not have the opportunity to be an incumbent in the position of motor repairman or welding machine repairman in February, 1968, was the fact that he had not at that time passed the electrical helpers test. The court having concluded that the Company's use of that test has not been shown to be actionable in this case under § 1981 (nor, for that matter, under Title VII), there is no legitimate basis for proceedings to determine whether the 1968 slotting perpetuated the effects of Foster Lewis of earlier events. *Cf. Evans v. United Airlines*, 14 FEP 1510, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

In any event, Lewis does not in reality face any more stringent conditions for entry into the craft than did the beneficiaries of the slotting agreement. Motor repairmen and welding machine repairmen performed the same type of work upon motors as did shop electricians, except for the panel work necessary to be shop electrician A. In fact, the employees in these positions trained shop electrician apprentices. The craft determination test, as noted, consists of actual work assignments. Therefore, there was no reason to test the employees slotted into the craft positions since they had already demonstrated their ability in their normal work routine.

In reality, there is nothing in the record to suggest that even if Foster Lewis had been an electrical helper, he would have been a motor repairman in February of 1968. All of those who were slotted into the shop electrician "B" position had greater seniority than Foster Lewis. The merger of those jobs into the shop electrician craft had no conceivable direct or immediately foreseeable impact on Foster Lewis.

---

**18.** With regard to the 1968 decision itself, the position of motor repairman was, as noted, not a craft position, but motor repairmen performed the same work as shop electricians. Before 1966 there was only one step difference in the respective three-job grades (A, B and C) for motor repairmen and shop electricians. As the result of collective bargaining, however, in 1966, all craft positions were upgraded two steps. Motor repairmen, not then classified as craftsmen, consequently found themselves three steps below the shop electrician grades. They filed grievances and refused to train shop electrician apprentices as had been the prior practice. Both the Company and the unions investigated, determined that the jobs were qualitatively congruent, and merged the motor repairmen into the shop electrician craft. Thirteen white motor repairmen and one black motor repairman were so merged.

**7. Designation of Refrigeration Repairman Position As A Craft in 1973 When It Had Previously Been A Noncraft Job**

The plaintiff has also contended that the designation in 1973 of the position of Refrigeration Repairman as a craft, thereby making it subject to the requirement of a craft determination test, is a policy which perpetuated the effects of past discrimination. As with the "slotting" of February, 1968, he appears to be arguing that the 1973 designation of the craft of Refrigeration Repairman required him to face more stringent qualifying conditions for becoming a Refrigeration Repairman than did those white employees who were incumbents in the position when it became a craft.

The evidence does not support a finding that the designation of the position as a craft was itself motivated by a racially discriminatory purpose and the court declines so to find.

■ There is nothing in the record to suggest that Foster Lewis would be a Refrigeration Repairman or qualified to be one if the position were still a noncraft or multirated job. The evidence is that Foster Lewis is *not* qualified for the job and, in fact, turned down an opportunity to be a Refrigeration Repairman Helper in 1969. The plaintiff was not injured, even if the crafting of the position could somehow be said to be racially discriminatory, because he was not and is not qualified to do the work of a Refrigeration Repairman and would not, therefore, have been hired in that position in any event. *East Texas Motor Freight v. Rodriguez, supra; International Brotherhood of Teamsters v. United States, supra; Mount Healthy City School District Board of Education v. Doyle, supra.*

■ Any assumption, however, that the crafting of the position, under the facts in this case, was racially discriminatory or created the type of artificial barrier condemned under Title VII as elucidated by *Griggs, supra,* is unwarranted. A craft determination test, at least as such a test is administered and composed under the facts demonstrated and stipulated in this case, is not an artificial barrier. Unlike the requirements of a high school diploma and aptitude tests in *Griggs,* which were found to be artificial because they were not job-related, the craft determination test here is an actual sample of the work required to be performed in the jobs of Shop Electrician (including the old Motor Repairman's job) and Refrigeration Repairman. There can be no doubt that it is job-related in the same sense that a typing test for the position of typist is job-related. Consequently, the craft determination test cannot be said to be a discriminatory barrier.

■ The premise that pervades all of plaintiff's arguments in this regard is that prior to the advent of Title VII he was relegated by the Company with the consent of the Unions to low paying black jobs which did not offer him the opportunity to obtain the skills needed to gain higher paying jobs, particularly craft jobs, and that today he is still affected by that past practice. But even assuming that there was such a past practice the only inquiry relevant here is the conduct of the Company and Union since September, 1967. Reprehensible as past discrimination is, Title VII is prospective only in its application. It does not require that the past be undone, only that present and future employment opportunities be nondiscriminatory. *See Griggs, supra,* 401 U.S. at 430–431, 91 S.Ct. 849.

**D. Civil Action 70–1127–M—The Case Against Local 2610 and The Union Under § 1981**

No allegations or proven facts by the plaintiff have established a legally significant basis for differentiating between the conclusions reached by the court in reference to the plaintiff's § 1981 claims against the Company and his § 1981 claims against the other defendants. For the reasons adequately set out above, the court has concluded that there is no liability of Local 2610 or of the Union to plaintiff under § 1981 in Civil Action 70–1127–M.

### E. Civil Action 70–1127–M—The Case Against Local 2610 Under Title VII

The one legally significant difference between the case against the Company under § 1981 and the case against Local 2610 under Title VII, which is not fully discussed in other sections of the Opinion, is the effect of the Electrical Helper Test in the context of the Local 2610 Title VII suit.

■ Although Local 2610 has contended that its lack of involvement in instituting or administering the test, as well as its negotiation of contract provisions with the Company in 1968 requiring that all tests be job related, absolve it of any possible liability under Title VII, the court cannot agree. The Company had a history of discriminating against blacks holding Production and Maintenance jobs and if Lewis had proven that the test had a disparate impact upon blacks "it would undermine Title VII's attempt to impose responsibility on both unions and employers to hold that union passivity at the negotiating table [19] in such circumstances cannot constitute a violation of the Act." Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 79, 478 F.2d 979, 989 (1973). The union is obligated to "negotiate actively for nondiscriminatory treatment" of its minority workers. Id.; see Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Patterson v. American Tobacco Co., 535 F.2d 257, 270 (4th Cir. 1976); Barnett v. W. T. Grant Co., 518 F.2d 543, 550 (4th Cir. 1975).

■ The fact that the Electrical Helpers Test continued to be a potential bar to the advancement of Foster Lewis after July 17, 1968, i. e. 180 days prior to his filing of an EEOC charge, brings the effect of the test within the applicable limitations period. 42 U.S.C. § 2000e–5(e); see Quarles v. Phillip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968); Robinson v. Lorillard Corp., supra; Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir.

1969). There is no basis in reason to distinguish, insofar as the statute of limitations is concerned, between a seniority system operating as a continuing bar to advancement and a test so operating.

Local 2610 relies upon the fact that Lewis passed the only version of the test in use within the limitations period (the change in tests was effectuated in June, 1967). But the test in use within the limitations period had six parts compared to the earlier test's two parts and, more importantly, one part remained the same while the second part apparently was replaced with a similar section. See Co's ¶ 59. Also, Lewis did not pass the test until after attending the special program instituted by the Company to help employees pass the test. Under these circumstances the court is warranted in concluding that the effects of the test continued into the limitations period.

■ Under Title VII, the Electrical Helpers Test could be found to be unlawful if it has had a discriminatory impact upon blacks, regardless of the intent with which it was adopted or utilized. Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). As discussed in detail in connection with the Company's liability under § 1981, Lewis has not met his burden of establishing that the test had a disparate impact upon blacks. Lewis has not "shown that the test[s] in question select applicants for . . . promotion in a racial pattern significantly different from that of the pool of applicants." Albermarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (emphasis added); Hazelwood School District v. United States, 429 U.S. 1037, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ Since Lewis did not meet his burden of proving that the test had a disparate impact upon blacks, the defendants, including the Unions, were not required to prove its job relatedness. Griggs v. Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. 849.

19. There was evidence, however, in this case that Local 2610 had actively negotiated with the Company since 1965 for the abolition of all tests.

### F. Civil Action 70–1127–M—The Case Against All Defendants Under The Labor Management Relations Act

No evidence was produced which connected the Company with any violation of the Labor Management Relations Act. There is evidence, plaintiff contends, which establishes a breach by the Unions of their duty of fair representation under said Act.

The grievance from which this claim emanated was filed by Lewis after he was rejected for a Shop Electrician vacancy. The Grievance Committee of Local 2610 rejected the grievance at the third step, the step before the Union normally becomes involved in the grievance process. The ostensible reasons that Local 2610 did not take the grievance beyond the third step were that Lewis had refused to take the Craft Determination Test and the Local's determination that the Company's refusal to hire Lewis as a Shop Electrician was not racially motivated. Lewis contends a subsequent group grievance filed by 13 white and one black employee which was taken to arbitration by the Unions presented the same issues as his grievance.

■ The merit of Lewis' grievance is not directly in issue. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The court must determine whether the rejection of the grievance by Local 2610 was "arbitrary, discriminatory or in bad faith." *Id.* at 190, 87 S.Ct. at 916. Lewis recognizes this but contends,

> ". . . the reason the unions processed the group grievance was because 13 white employees were involved, and, the reason it refused to process Lewis' grievance was because of his race, Negro. Plaintiff takes this position because both grievance (sic) were similar in nature, and involved the same craft and test, the only difference being that Lewis also complained of racial discrimination."

(Pl's Brief at 44). Thus, the basis for Lewis' claim is his contention that the only difference between the grievances was his charge of racial discrimination. This is clearly erroneous.

■ Lewis had not even passed the Electrical Helpers Test when he applied for the Shop Electrician position. His grievance was to the effect that he should be awarded the position despite his inability to perform its duties because he had been discriminatorily denied training opportunities. In contrast, the group grievants were complaining of the Company's refusal to give them assignments from which they could learn the skills necessary to pass the panel portion of the Craft Determination Test and, thereby, upgrade themselves to an "A" position. The Unions based their arbitration brief upon a contract provision covering periodic testing for upgrading which, they argued, implicitly promised exposure to work needed to be learned for upgrading. The mere fact that both sets of grievants in their original grievances demanded training and both charged that the Craft Determination Test was not job related does not eliminate the obvious differences in their situations. In fact, the two sets of grievants appear to have meant two different things by charging that the Test was not job related. The group grievants obviously were focused upon the panel work part of the Test while Lewis made a general charge. Also, in the arbitration proceedings for the group grievance the Unions did not argue that the Test was not job related, but instead relied upon the breach of contract argument.

Other facts demonstrate the lack of merit in Lewis' suggestion that the Grievance Committee acted with a discriminatory motive in rejecting his grievance at the third step. Although Lewis has made no reference to the vote of the Committee in rejecting his grievance, the evidence shows that the vote was unanimous. Of the 10 members of the Committee three were black. (U's Ex. 114). One of the black members was Lewis' brother. *Id.* Apart from the composition and vote of the Committee regarding Lewis' Shop Electrician grievance, the fact that the Unions processed to arbitration a grievance filed by Lewis on July 1, 1969, two weeks after his Shop Electrician grievance, demonstrates the lack of discriminatory intent or bad faith affecting the Unions' decisions.

### G. *Civil Action M–75–1536—The Case Against All Defendants*

In Civil Action No. M–75–1536, Lewis claims to have lost overtime pay due to the Company's use of Motor Inspectors as Winch Truck Operators. *See* Text *supra* at 957, 958.[20] Lewis also claims that the Company and Unions have retaliated against him for his filing of EEOC charges and Civil Action No. 70–1127–M. The claimed retaliation has taken the form of (1) refusals to process his grievances, (2) job assignments with lower pay than he is entitled to, and (3) poor working conditions.

Lewis contends that his loss of overtime pay as a Winch Truck Operator was due to his inability to qualify as a Motor Inspector since Motor Inspectors were being used as Winch Truck Operators. This is an attempt by Lewis to demonstrate a nexus between the crafting of the Motor Inspector position in 1965 and an injury to himself. *See* Text *supra* 956 n. 7. At trial the court granted defendants' motions to dismiss any claim based upon the actions of the defendants regarding the crafting of the position. *See* Text *supra* at 956. In light of its previous findings as to Lewis' allegations concerning the Motor Inspector job, this court finds that plaintiff has failed to produce sufficient evidence to show that he was denied overtime pay because of his race.

Lewis' charges of retaliation present a factual issue to be decided by the court and the court's findings are set forth in the text *supra* at 962. Title VII specifically makes it unlawful to discriminate against an employee because the employee has filed an EEOC charge:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

42 U.S.C. § 2000e–3(a). As previously discussed, this court finds that plaintiff failed to produce sufficient credible evidence to support his allegations of retaliation because of his filing of charges with the EEOC or his filing of Civil Action No. 70–1127–M.

### Conclusion

For all the above reasons, plaintiff has failed to establish his case by a preponderance of the evidence as to any claim in either of the instant cases. Judgment will be entered for the defendants without costs.

---

**20.** Any claim by Lewis relating to discrimination in training which conceivably could be deduced from the very vague and general terms of his complaint would be grounded upon the Electrical Helpers Test. Although Lewis' claims in Civil Action M–75–1536 are brought against the Company and Local 2610 under both Title VII and 42 U.S.C. § 1981, any claim emanating from the Electrical Helpers Test would be untimely. The EEOC charge upon which the complaint is specifically based was filed May 17, 1974, five years after Lewis passed the test. All bars to Lewis' advancement were removed when he passed the test. As discussed earlier, if the court accepted Lewis' virtually unsupported contention that a loss of "seniority unit" seniority would occur upon transfer between units in Department 32, it still remains a fact that a majority of the higher paying positions in Department 32 are in Unit 438. All of the positions upon which Lewis has focused, Refrigeration Repairman, Motor Repairman, Welding Machine Repairman, and Motor Inspector were in Unit 438.