TORRUELLA, Circuit Judge
(Dissenting).
I am compelled to dissent because Plaintiffs-Appellants (“Plaintiffs”) have raised genuine issues of material fact that require a trial before a fact finder. This is especially the case when one considers the actions of the majority in raising motu proprio an affirmative defense, namely the so-called safe harbor defense, for the first time on appeal notwithstanding Defendants-Appellees’ (“Defendants” or “FEMA”) failure to raise that defense, either before the district court or before this court.
I. Background
A. The Discrimination Claims
As the majority opinion recounts, the facts of this case go back to 1995 when, in response to Hurricane Marilyn’s effects on Puerto Rico and the U.S. Virgin Islands, FEMA opened the Puerto Rico National Processing Service Center (“PR Center”), which started originally as a tele-registration center, or call center.
The scope of FEMA’s operations in the PR Center evolved over the following decade to the point that it became one of its four national claims-processing centers in the United States, carrying out the same duties that the other FEMA centers performed in the mainland, with the additional benefit that — its personnel being bilingual — it was able to handle calls and process claims from both English and Spanish speakers. Contrary to the majority’s assertion, it is undisputed by both Plaintiffs and Defendants that Plaintiffs are all of Puerto Rican national origin and comprise approximately ninety-eight percent of the PR Center’s workforce.
As the majority describes, when the PR Center employees realized they had been under-compensated for the same work performed by their counterparts in other FEMA centers across the United States, some employees complained to management about this situation and eventually filed complaints for equal pay before the agency’s Equal Employment Opportunity Office (“EEOO”), alleging that by paying them less, FEMA engaged in disparate impact discrimination on the basis of their national origin. FEMA settled some of these claims in 2006. Later, another group of employees also filed formal discrimination complaints before the EEOO and requested certification as a class action.
What is striking about this second round of complaints is the curious chain of events that began only two months after these filings. In June 2007, the agency’s Occupational, Safety & Health Office performed an uncommon inspection of the PR Center’s premises. For the first time in twelve years it carried out a Management Evaluation and Technical Assistance Review (“METAR”). While multiple building deficiencies and safety needs were found in this 2007 METAR, by the time FEMA performed a follow-up building rpview in May 2008, most of the deficiencies had been properly addressed and corrected. In the meantime, FEMA’s Puerto Rican employees continued their battle for equal pay. The second round of discrimination complaints that had been filed briefly before the 2007 METAR were dismissed in February 2008, following a denial of the class certification. Instead, the FEMA administrative judge ordered the complain *262 ants to re-file their claims individually, which Plaintiffs contend that they did.
B. Procedural History
In essence, Plaintiffs’ case is that, faced with this scenario, FEMA crafted a business necessity to justify placing them in a rotational staffing plan, and then closing the PR Center and ordering their termination. According to Plaintiffs, FEMA did this by inspecting the PR Center premises and issuing a list of safety concerns that allegedly required closing the center immediately for repairs, and only allowing a limited number of employees to continue to work on a rotational basis. Because FEMA had never raised concerns regarding the building’s conditions prior to that point, and the safety issues were either non-life-threatening or quickly resolved, Plaintiffs argued that FEMA should have suspended the rotational staffing plan and allowed them to return to work. In response to the rotational staffing plan, Plaintiffs also filed approximately 300 complaints. Meanwhile, FEMA did some number-crunching and came up with a reduction in operational needs for its nationwide claims processing centers that allegedly justified closing the PR Center altogether. Plaintiffs responded that this was in retaliation for their complaints over the rotational staffing plan, and that far from this representing a valid business necessity that would justify their termination, FEMA historically had released employees based on performance and not on location. They claim this could have been done by releasing employees from all centers rather than simply closing the PR Center.
In sum, Plaintiffs’ request for relief on appeal is that we remand this case so that a fact finder can decide whether their alternatives to FEMA’s business needs defeat FEMA’s justifications, and whether FEMA’s adverse actions against Plaintiffs is the result of retaliatory actions arising from their claims for equal working conditions and their requests to return to work during the rotational staffing plan. The former can be shown by establishing that Plaintiffs’ alternatives served FEMA’s alleged business necessity without the discriminatory impact on them or that FEMA’s justifications for both the rotational staffing plan and the PR Center closure were pretextual. The latter could be found by a reasonable jury based on the close temporal proximity of the adverse actions to the protected complaints for equal working conditions and the complaints filed in response to the rotational staffing plan. Pretext can also be inferred from Plaintiffs’ challenges to the graveness of the alleged safety deficiencies.
FEMA, on the other hand, asserts that it based its decisions on ensuring “the safety and security of [its] employees,” and the district court agreed with this by finding that there were “fire and safety deficiencies.” FEMA also justified its closure decision on the reduced needs for the PR Center within its nationwide operations.
The majority now forecloses Plaintiffs’ claims by raising a safe harbor defense on behalf of FEMA, which FEMA never raised and, in any event, does not protect one of the adverse actions raised by Plaintiffs, i.e., the decision to terminate them.
II. Defendants Never Raised the Safe Harbor Defense
Even if the safe harbor provision of 42 U.S.C. § 2000e-2(h) raised by the majority allows an employer to discriminate in practice against employees on the basis that they work in different locations, it is an affirmative defense that was not once mentioned by FEMA at any stage in this proceeding. See Am. Tobacco Co. v. Patterson, 456 U.S. 63, 86-87, 102 S.Ct. 1534, *263 71 L.Ed.2d 748 (1982) (“Section 703(h) provides an affirmative defense....”) (Stevens, J., dissenting); Marcoux v. Maine, 797 F.2d 1100, 1108 (1st Cir.1986) (“The district court thought it a matter of affirmative defense for defendants to establish that the disparity in benefits ... was based on a factor other than sex.”). See also Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1012 (11th Cir.1982) (“The district court held that the [defendant] waived its right to advance this claim by failing to plead it as an affirmative defense under Fed.R.Civ.P. 8(c). We agree.”); Gunther v. Cnty. of Wash., 623 F.2d 1303, 1313 (9th Cir.1979); Firefighters Inc. For Racial Equal. v. Bach, 611 F.Supp. 166, 170-71 (D.Colo.1985) (“§ 703(h) fell within the general rule that statutory exemptions from remedial statutes are affirmative defenses because ‘§ 703(h) serves to exempt from Title VII the disparate impact of a bona fide seniority system.’ ” (quoting Jackson, 678 F.2d at 1013)).
However, the majority defends its unusual action of raising the safe harbor on behalf of the Defendants by pointing to the factors considered in Chestnut v. City of Lowell, 305 F.3d 18, 24 (1st Cir.2002). Specifically, it claims that at least four of the following six factors applied in that case allow this court to consider a waived defense, even if it was not raised by the parties on appeal: (1) whether the waived issue is purely legal; (2) whether the issue is of constitutional magnitude; (3) whether the “omitted argument [is] highly persuasive”; (4) whether consideration of the argument would prejudice the plaintiff; (5) whether the omission was inadvertent; and (6) whether the issue “implicated a matter of great public concern.” I disagree with the majority’s analysis of these factors as none justify applying the waived defense in this context.[16]
First, I agree that, assuming it is appropriate to consider this defense, we have a purely legal matter. But the outcome of this question is not entirely favorable to Defendants because, as will be explained in more detail, the safe harbor defense is not applicable to discharge situations and has never been applied in contexts similar to the instant case.
Second, there is no basis in the record to hold that this is an issue of constitutional magnitude requiring that the court steps into arguments not properly raised by the parties. If there is a constitutional issue, it is raised by the majority’s actions in denying Plaintiffs the process which is due to litigants by preventing them from being heard on issues that were not before the court.
Third, whether the omitted argument is “highly persuasive” is easily questioned because, as previously stated and will be further discussed, the safe harbor defense is inapplicable to cases of termination.
Fourth, on the question of whether passing by the court on the omitted argument would be prejudicial to Plaintiffs, the majority concludes that there is no prejudice. I ask, can it be seriously argued that Plaintiffs are not prejudiced when this court decides their case mainly on arguments and issues not raised by Plaintiffs’ party opponents and as to which Plaintiffs were not given an opportunity to rebut? The answer is a self-evident and obvious “of course there is prejudice.”
*264 Fifth, whether the omission was inadvertent is not easily resolved. Here, there are two possible explanations for their omission: either Defendants did not argue the safe harbor defense because it simply does not apply or Defendants made a conscious choice to only raise the business necessity as a defense. It is possible that FEMA chose not to attack the proof offered in support of Plaintiffs’ prima facie case by raising this defense, because a “defendant may confess [disparate impact] and avoid [this issue], acknowledging the legal sufficiency of the prima facie case but endeavoring to show either that the challenged practice is job-related and consistent with business necessity, or that it fits within one or more of the explicit statutory exceptions covering bona fide seniority systems, veterans’ preferences, and the like.” EEOC v. S.S. Clerks Union, Local 1066, 48 F.3d 594, 602 (1st Cir.1995) (emphasis added) (internal citations omitted). Therefore, a defendant is free to rebut the prima facie case by doing three things: (1) attack the plaintiffs prima facie proof (which did not happen in this case) (2) prove a business necessity (which is what FEMA chose), or (3) raise a safe harbor defense (which is what the majority did for them). Here, Defendants only chose the second option. Therefore, I do not see how we can readily conclude that the omission to raise the defense the majority is now raising for them was necessarily “in-ádvertent”. This conclusion is reinforced by the fact that Defendants were represented by competent counsel who must have been aware that this defense was not available in similar termination cases.
Sixth, it is hard to comprehend how this defense is a matter of public concern that requires the court raising the defense on their behalf.
In any event, even if validly raised by the majority on behalf of Defendants, for the reasons explained below, the safe harbor defense does not help FEMA in this case.
III. The Safe Harbor Does Not Apply to Disparate Impact Involving Termination
This defense applies to disparate impact on employee benefits and working conditions. The main case cited by the majority in support of raising the safe harbor for the Defendants, Candelario Ramos v. Baxter Healthcare Corp. of Puerto Rico, 360 F.3d 53 (1st Cir.2004), has to do with disparate impact in pension benefits, not termination. The instant case appears to be the only case where a court has applied this affirmative defense in the context of termination.[17]
As required by our legal training, we begin by examining the full text of the safe harbor provision, which reads as follows:
(h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions
Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit *265 system, or a system which measures earnings by quantity or quality of 'production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29.
42 U.S.C. § 2000e-2(h) (emphasis added).[18]
There is not an iota of language in this statutory provision which can lend support to the majority’s application of this provision to freely allow terminations without Title VII liability. The majority’s interpretation is an absolute distortion of the plain and unequivocal language of this statute. We need go no further as this statute speaks for itself. “[Rjeliance on legislative history is unnecessary in light of the statute’s unambiguous language.” Mohamad v. Palestinian Auth., — U.S. —, 132 S.Ct. 1702, 1709, 182 L.Ed.2d 720 (2012) (quoting Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 236 n. 3, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010) (internal quotation marks omitted)). See also Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (“[W]e do not resort to legislative history to cloud a statutory text that is clear.” (alteration in original) (quoting Ratzlaf v. United States, 510 U.S. 135, 147-148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994))).
Nevertheless, the legislative history of this provision fully supports its plain meaning and has been explained in great detail by the Supreme Court. Its enactment stems from. Congress’s concern for allowing the uninterrupted continuation of existing seniority discrepancies and vested benefits when Title VII became effective. Specifically, Congress responded with this section as an amendment to the original bill after it passed the House because of the opposition to Title VII’s potential effects on union seniority systems, and since the Congressional intent behind Title VII was not to affect the vested rights of employees. See generally Beth W. Brandon, The Seniority System Exemption to the Title VII of the Civil Rights Acts: The Impact of a New Barrier to Title. VII Litigants, 32 Clev. St. L.Rev. 607, 611-13 (1983-84). See also Patterson, 456 U.S. at 81-83, 102 S.Ct. 1534 (explaining the legislative history and the “fears [that] were expressed concerning ... seniority rights and existing seniority systems” (citing Franks v. Bowman Transp. Co., 424 U.S. 747, 759, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976))); Pullman-Standard, Inc. v. Swint, 456 U.S. 273, 284, 102 S.Ct. 1781, 72 *266 L.Ed.2d 66 (1982) (examining whether a union’s seniority system was protected by § 703(h) defense); Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 143-45, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (examining § 703(h) defense on discrimination in disability plan and benefits); Robinson v. Shell Oil Co., 519 U.S. 337, 343, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (“Of course, there are sections of Title VII where, in context, use of the term ‘employee’ refers unambiguously to a current employee, for example, those sections addressing salary or promotions. See § 703(h), 42 U.S.C. § 2000e-2(h) (allowing different standards of compensation for ‘employees who work in different locations’ ”)); AT & T Corp. v. Hulteen, 556 U.S. 701, 708-10, 129 S.Ct. 1962, 173 L.Ed.2d 898 (2009); Goodman v. Merrill Lynch & Co., 716 F.Supp.2d 253, 261 (S.D.N.Y.2010) (explaining what is a bona fide “merit, seniority, or production-based compensation system”).
Cases dealing with hiring practices to which the employer applies a “bona fide merit system” allowed under § 703(h) are nonetheless subject to the same disparate impact analysis requested by Plaintiffs in the instant case. This analysis is to be applied in the same manner that it was established by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), instead of just applying this safe harbor defense. See Guardians Ass’n of N.Y. City Police Dept., Inc. v. Civil Serv. Comm’n, 633 F.2d 232, 253-54 (2d Cir.1980). Because that is the framework used for hiring decisions, it is odd to differentiate the analysis required in the instant case — as the majority proposes — by holding that when it comes to termination, rather than performing a disparate impact analysis, courts may just turn to a safe harbor that was intended to regulate benefits and conditions of employment. Notably, the majority’s only basis for applying the safe harbor in this context is that Candelario Ramos — which involved pension benefits- — calls for a broad application, and that there are some cases in which it was been applied to promotion decisions, which are more akin to benefits and conditions of employment than to hiring and termination decisions.[19]
In synthesis, I disagree with the majority’s application of the safe harbor in this context. Because the safe harbor should not be dispositive of this case, the court needed to examine closely the material facts in controversy raised by Plaintiffs.
IV. Factual Controversies
A. FEMA’s Sudden Concern over Employees’ Safety
The first problem with the story that FEMA offers to support the alleged adverse actions is that, even accepting the severity of the safety concerns on which their business-necessity justification was partly premised, the findings of the June 2007 METAR inspection are very similar to those of the 2008 review, and yet, the need for action (closing the center for repairs) on previously non-threatening conditions arose unexplainably in 2008. The findings were that: a reevaluation of the fire alarm system and related emergency procedures needed to be conducted; assessment and modification of the building’s egress routes was needed; the facility did not have a hazardous communication, material or ladder safety program; OSHA Form 300 log and injury and incident report form 301 procedures were not updated; exit signs were not present at several locations throughout the facility; internal *267 safety orientation training not provided, among other similar needs. By the time the 2008 review was performed, all matters were either corrected or had a corrective plan in effect. In fact by May 21, 2008, FEMA’s own internal communications show that the “only item pending on the [2007] METAR which [had] not been solved” was the construction of a new egress route. It bears noting that this egress route had never been a concern of FEMA, as the building never had one since it was first occupied by FEMA in 1995. In fact, the egress pathway and ramp that were mentioned in the 2007 METAR were only recommended as “mid-long term recommendations.” Also, the property lease for this facility had 'been renewed periodically but the facility was not inspected every time it was renewed.[20] For twelve years, FEMA officers and managers visited the PR Center without ever raising any concerns about dangerous conditions on site.
Furthermore, Plaintiffs argue that the 2008 review findings that were necessary for re-occupancy of the PR Center were minimal.[21] These included conducting a fire watch in the building during occupancy, removing magnetic locks from exit doors, removing all storage in the egress corridors, updating and practicing the Occupant Emergency Plan, installing a secondary egress man-gate on the perimeter fence at the rear of the building, adding additional fire extinguishers, and obtaining fire hydrant flow test information. Crucially, the 2008 review report did not recommend closing the PR Center or reducing its capacity by implementing the rotational staffing plan. And, by July 2008, the concerns identified in the May 2008 review— which Plaintiffs insist were not life threatening — had already been resolved. In sum, even assuming the validity of FEMA’s business necessity to assure the safety of its employees, a jury could reasonably agree with Plaintiffs’ compelling dispute of FEMA’s justification for denying their alternative option to the rotational staffing plan which was to reoccupy the PR Center’s premises and continue working.
B. The Newly Discovered Reduction of Operational Needs
As the email exchanges between FEMA officials contained in the record reveal, FEMA began looking for justifications for the permanent closure of the PR Center after the initial emergency closure for repairs on May 16, 2008; following the 2008 review. At that point, the record shows that FEMA did not possess metrics, data, or statistics showing that the PR Center was not necessary to its operations nationwide or even measuring the potential effects of its closure on the agency’s operations. What’s more, some FEMA officers did not even know why the agency had come to concentrate on Puerto Rico, at the time. That is, FEMA first closed the center and instituted the rotational staffing plan before it had collected the evidence to come up with one of its “business necessity” justifications. Plaintiffs presented an email sent by the Deputy Administrator of FEMA on May 26, 2008, asking things like the “desired capacity and exactly how we can achieve [it] without Puerto Rico”; “[w]hat do we expect to be [our] Spanish language requirement and what options *268 will we have?”; “[w]ant to show that they are typically a small part of the whole system, and that the system has the capacity to absorb the Puerto Rico workload”; “[h]ow long have the facility deficiencies existed and why are we just being attentive now?”; .“[hjave there been any trends that reduce the role of the NPSC?”; “[cjan we show trends in greater usage of online?”; “[w]e need to show that we can live without Puerto Rico, even in a catastrophic situation”; and “[wje will need to identify each of the other sites and indicate why we would not close them or reduce their capacity.” Nevertheless, the agency based its justification for the rotational staffing plan and closing the PR Center on the firm conviction that, in addition to it being a safety concern, it was no longer necessary to its operations. Indeed, the data on operational needs and statistics was only known — by December 2008 — when the decision to close permanently was made, and after all the alleged “life-threatening” safety concerns had already been addressed. It is hard to see how the safety of the employees was still an issue by the time the data needed to support the second part of the alleged business necessity was collected. „
As part of its operational justifications for the closure, once the rotational staffing system had been implemented, FEMA quantified an alleged reduction in Spanish calls. Plaintiffs contend, however, this is irrelevant because the employees in the PR Center were bilingual and had been processing calls and claims from all across the United States for years. Furthermore, Plaintiffs argue that as of October 2008, even before the final closure of the center, FEMA already had had to contract external language services.
The majority states that it agrees with the district court that the rotational staffing plan served FEMA’s needs by allowing it to have some employees in the PR Center, despite the building’s unsafe conditions, so that they could assist in a disaster scenario. This seems completely incon-gruent with FEMA’s claim that it had no operational need for the PR Center only a few months after the rotational staffing plan began. It is nonsensical to say that the justification for closing the PR Center permanently was that FEMA did not need those employees because of reductions in operations while recognizing that FEMA had a legitimate need of maintaining at least some of them in that same center to assist in the event of a disaster.
Plaintiffs also allege that, whenever FEMA faced a need for reduction in workforce in the past, it released employees nationwide based on performance. While Plaintiffs do not argue that FEMA regulations required it to do so, they claim that the agency departed from its prior practice only to discriminate against them by closing the PR Center and ordering their termination. The majority’s answer to Plaintiffs’ alternative consisting in that FEMA should have terminated employees on a national level based on performance is a non sequitur. It claims that FEMA could not do that because it had also just realized that it had a budgetary need to close the PR Center. Plaintiffs’ argument, however, is not that FEMA could release employees across the United States based on performance while leaving the PR Center in service. What they argue is that it could have closed the PR Center and still kept some of the Puerto Rican employees in other centers in the mainland by releasing employees because of their performance and not in a way that had a disparate impact over Puerto Rican employees, or over employees that had filed hundreds of complaints for disparate working conditions and compensation.
*269 Relatedly, Plaintiffs also dispute that some employees were allowed to transfer to other National Processing Service Centers because at the time the decision to permanently close the PR Center was made, they were given only twenty-four hours to decide whether they wanted to move to the mainland. Furthermore, not all were offered positions in another center and most were asked to reapply and compete for new openings in those positions.
Taken together, all these facts become increasingly suspicious when considering that the employees in the PR Center had always been classified as call center employees, while their non-Puerto Rican counterparts in the mainland were classified at higher pay scales for doing the same claims-processing tasks. Over the previous two years, Puerto Rican employees had been battling FEMA over equal pay. Moreover, in the case of Program Specialists, they complained about the discrepancy in pay, and when FEMA agreed to bring them to the corresponding classification, they were placed in the lowest step of the classification, and denied increases earned as well as back pay. In addition, when the final closure decision was made, the PR Center employees had filed over 300 complaints with the EEOO because of the rotational staffing system imposed after the initial closure following the May 2008 review.
Thus, I disagree with the majority that Plaintiffs are not entitled to have their day in court — not even for their retaliation claims' — to show that FEMA’s justification to terminate them and close the PR Center based on safety concerns and the alleged reduced operational needs, were simply pretextual because its true reason was to avoid the discrimination complaints brought by the Puerto Rican employees. These questions of fact are in no way foreclosed by the Supreme Court’s recent decision in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., — U.S. —, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015), as the majority implies. At a minimum, “[a] court must determine that a plaintiff has shown that there is ‘an alternative ... practice that has less disparate impact and serves the [entity’s] legitimate needs.’ ” Id. at 2511 (alterations in original) (quoting Ricci v. DeStefano, 557 U.S. 557, 578, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009)).
I agree with the majority that disparate impact claims must be examined cautiously to avoid interjecting racial considerations into every agency decision and to avoid causing potential defendants to establish racial quotas. Maj. Op. at 255-56 (citations omitted). However, there are two problems with relying on those public policy considerations to dismiss this case. First, Plaintiffs’ claims are not limited to disparate impact concerns. Indeed, they raise serious controversies of material fact regarding conspicuous acts of retaliation. Second, Plaintiffs never asked for anything close to establishing quotas to guarantee the employment of Puerto Rican employees. They present triable issues of material fact as to whether — even assuming the validity of FEMA’s justifications — their proposed non-discriminatory alternatives served FEMA’s alleged business necessity.
C. Pretext Analysis in Disparate Impact Claims
Even though Plaintiffs expressly conceded in oral argument that they do not advance any of their claims as disparate treatment claims, this does not change the required analysis for pretext under disparate impact and retaliation. Therefore, Plaintiffs should be allowed their day in court to prove that their alternatives to FEMA’s alleged business needs defeated the same, and that the adverse actions *270 were retaliatory. In addition, they should be allowed to establish as part of their disparate impact claims that the justifications for the adverse actions were pretex-tual.
In cases for disparate impact the analysis is also subject to the well-known burden-shifting standard, which allows for a plaintiff to prove pretext. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (applying burden-shifting analysis for pretext in a disparate impact case); see also S.S. Clerks Union, Local 1066, 48 F.3d at 602 (same); Abbott v. Fed. Forge, Inc., 912 F.2d 867, 876 (6th Cir.1990) (considering burden-shifting analysis and pretext in a disparate impact case); Bronze Shields, Inc. v. N.J. Dept. of Civil Serv., 488 F.Supp. 723, 726-27 (D.N.J.1980) (applying burden-shifting analysis and considering a 42 U.S.C. § 2000e-2(h) defense in a disparate impact claim under Griggs).
In fact, in S.S. Clerks Union, Local 1066, 48 F.3d at 601-602, we discussed extensively the applicability of the burden-shifting analysis to disparate impact claims. In that case, we also mentioned the importance of raising exceptions — including seniority systems — as defenses. Id. Having explained the requirements for a prima facie showing, we went on to state:
At that point, the defendant has several options. First, it may attack the plaintiffs proof head-on, debunking its sufficiency or attempting to rebut it by adducing countervailing evidence addressed to one or more of the three constituent strands from which the pri-ma facie case is woven, asserting, say, that no identifiable policy exists, or that the policy’s implementation produces no disparate impact, or that the plaintiffs empirical claims — such as the claim of causation — are insupportable.
Alternatively, the defendant may confess and avoid, acknowledging the legal sufficiency of the prima facie case but endeavoring to show either that the challenged practice is job-related and consistent with business necessity, or that it fits within one or more of the explicit statutory exceptions covering bona fide seniority systems, veterans’ preferences, and the like. In all events, however, a defendant’s good faith is not a defense to a disparate impact claim.
If the defendant fails in its efforts to counter the plaintiffs prima facie case, then the factfinder is entitled — though not necessarily compelled, to enter judgment for the plaintiff. On the other hand, even if the defendant stalemates the prima facie case by elucidating a legitimate, nondiscriminatory rationale for utilizing the challenged practice, the plaintiff may still prevail if she is able to establish that the professed rationale is pretextual. The plaintiff might demonstrate, for example, that some other practice, without a similarly undesirable side effect, was available and would have served the defendant’s legitimate interest equally well. Such an exhibition constitutes competent evidence that the defendant was using the interdicted practice merely as a ‘pretext’ for discrimination.
Id. at 602 (citations and internal quotation marks omitted) (emphases added). Based on the above-cited text, the Defendants in this case should have raised their business necessity or the safe harbor defense. They chose only the former and it is still subject to pretext. Thus, Plaintiffs should also be allowed to prove their pretext argument before a fact finder.[22]
*271 V. Conclusion
For the foregoing reasons, I would remand this case for trial. The majority is wrong as a matter of law that Defendants’ adverse actions against' Plaintiffs are protected by an affirmative defense that Defendants did not raise either before this court or the district court. In addition, that safe harbor defense does not protect an employer’s decision to terminate employees, as shown by the clear text of 42 U.S.C. § 2000e-2(h), its legislative history and case law.
Plaintiffs deserved a chance to prove that their alternatives to FEMA’s adverse actions reasonably accommodated FEMA’s business necessities — to the extent that these were valid — without having a disparate impact against them, and they should have a chance to prove that reasons to place them in a rotational staffing plan and then terminate them were pretextual. Specifically, a jury should decide the genuine disputes as to material fact regarding: (1) whether FEMA’s 2007 METAR inspection and the 2008 follow-up building review were causally related to Plaintiffs’ protected conduct; (2) whether the findings of these inspections support FEMA’s alleged business justifications for the rotational staffing plan and the Plaintiffs’ termination, particularly, in light of Plaintiffs’ challenges to the severity of the safety concerns and their questioning of the alleged reduction in operational needs; (3) whether the safety concerns required FEMA to close the PR Center for repairs since the record shows that these had never been a concern of FEMA, the 2007 METAR results did not require closing for repairs and having a rotational staffing plan, while almost identical findings did require so in 2008, the safety concerns had been corrected by the time the decision to permanently close the center was made, and since the only missing items, ie., the egress pathway and ramp, were only listed as “mid-long term recommendations”; (4) whether Plaintiffs’ non-discriminatory alternatives to the adverse actions would not serve FEMA’s business necessities; and (5) whether FEMA’s justifications were pretextual.
For the reasons stated, I dissent.

. The cases cited by the majority are distinguishable because in those cases the court used this framework to analyze whether it should allow an argument that was waived below but was raised on appeal. Here, by contrast, Defendants did not even mention the safe harbor on appeal.

. We note that this safe harbor has been raised by defendants in cases where a plaintiff was terminated because a bona fide seniority system adopted as part of a labor agreement contains "last hired-first fired" language regulating furloughs in the context of reduction of force decisions. See Cates v. Trans World Airlines, Inc., 561 F.2d 1064, 1066 (2d Cir.1977). That, however, is entirely different from the instant case, where — even assuming no retaliation — employees ' were terminated based on location, not to comply with a bona fide seniority system.

. Note that the general provision of the statute establishes that it "shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment. ...” 42 U.S.C. § 2000e-2(a). Yet, 42 U.S.C. § 2000e-2(h) provides a safe harbor for different standards of compensation; and other terms and conditions of employment, but is,completely silent as to hiring and termination decisions. The narrower language of the safe harbor supports the conclusion that it was not intended to serve as a defense to avoid liability for hiring and firing decisions.

. It is also particularly incongruous that these employees were discriminated against for being in different locations when they had to have higher qualifications because they had to be bilingual to receive calls in Spanish and English.

. The lease of the PR Center property was up for renewal in September 2008, but the facility was closed temporarily on May 16, 2008, and then partially re-opened during the rotational staffing plan.

. A former FEMA Branch Chief stated that the building condition issues were "easily correctable." The cost of the repairs was estimated at $75,000.

. The majority argues that this last step of the burden-shifting analysis regarding pretext can be avoided in disparate impact cases because the Supreme Court left it out of its *271 restatement of applicable law in Ricci, 557 U.S. at 578, 129 S.Ct. 2658. However, in Ricci, the Court was quoting the statute in § 2000e-2(k)(1)(a)(i), which codified the cause of action for disparate impact recognized in Griggs. That statutory text was enacted in 1991, which suggests this court was aware of it when the opinion was issued in S.S. Clerks Union, Local 1066, in 1995.